# P.

## Case No. 18,311.

### Case of PEA PATCH ISLAND.

[1 Wall. Jr. Append. ix.] [1]

Arbitration at Philadelphia. Jan. 15, 1848.

BOUNDARIES—DELAWARE AND NEW JERSEY.

The territory of the state of Delaware within the "twelve miles circle" extends across the Delaware river to low water mark on the Jersey shore.

About the year 1783–84, there appeared at low tide in the Delaware river, about five miles below New Castle, a small muddy exposure of the soil, "about the size," as was testified, "of a man's hat." By the force of alluvion and deposit the exposure became larger and larger, until, by degrees, it formed an island of about 87 acres, which in consequence of a tradition that a vessel laden with peas had once sunk on the spot where the island afterwards rose, got the name of the "Pea Patch Island." In 1784, the proprietaries of West Jersey granted this island, describing it as situate in Salem county, New Jersey, to persons whose title became afterwards vested in Dr. Henry Gale of that state; and in 1831, the same state, by an act of its legislature, relinquished to Dr. Gale whatever interest it might have in the island. It had previously declared that its west boundary, at this place, came to the middle of the main channel of the Delaware river, a location which, as the main channel was then supposed to run, included the Pea Patch Island as within the territory of New Jersey. In 1813, the state of Delaware, by an act of its legislature, conveyed the island to the United States, who soon after took possession of it and began to erect a fortress upon it. In, consequence of these two grants, a controversy as to the right to the island began between Dr. Gale, claiming under the title of New Jersey, and the United States claiming under that of Delaware. In the ordinary case of a dispute as to title between an individual and the government, the matter would not have attracted publick notice; but this case differed in several respects from an ordinary case. In the first place, it brought in question the boundary between the states of New Jersey and Delaware; and to common apprehension it brought, moreover, some disparagement to one state or the other, both of which had apparently treated the island as within its own limits, and both of which, it was asserted, had granted it away, as its own property. Publick attention was moreover directed to the matter from the accidental position of the island itself. Above it lie many principal towns or cities of the three states of Delaware, Pennsylvania and New Jersey, which could be readily devastated by an enemy's fleet unless the river was protected from below; while it so happens, from the width, the course, or the shifting character of the Delaware channel, that there is scarcely any point either above or below, that offers a place where adequate defences could be erected for any of them. This island, however, constitutes the key of defence of the whole river. It stands just in the centre of its entrance and commands its two channels, of which the deepest runs close along its side, and the other is so curved as to lie for a great distance directly and most favourably exposed to its guns. A fortress had been partially erected on the island by the United States during the war of 1812, but was destroyed by fire some

years after. And all the towns along the Delaware river, lying, as already stated, naked to attack from any enemy who might pass up it, were kept in great uneasiness during those many years in which the "Maine Boundary," the "French Indemnity," the "McCleod Arrest" and the "Oregon Boundary" had kept our relations with the two great naval powers of France and England in uncertainty, and put them, at times, in danger of immediate rupture. Of course, they were constantly imploring congress to complete or rebuild the fortress upon this island, the only place, as all agreed, where an adequate defence could be erected; while at the same time the New Jersey claimants would appear with assertions of title to the island, fortified by written opinions from the law officers of the government itself,[2] and by remonstrances from citizens of New Jersey against such an unlawful invasion of their territory as was contemplated by assuming possession of the island, except under grant of the individual proprietor. In addition to this, the matter had attracted attention from a great number of unsuccessful attempts—necessarily publick ones—by the departments and by congress to settle it; from an uncommon number of opinions of directly opposite conclusion, from lawyers of publick name, both those connected with the government and those in private station; and finally from two judgments in two different circuits of the United States, which were in like conflict, and under which, in a suit between the same parties, the harmonious operation of the federal courts was made the witness of a marshal of one district turning out of possession the tenants who had lately been put in by the marshal of another! It would unnecessarily incumber this preliminary history of the case to record the various presidential recommendations, the reports of committees, the opinions of district attorneys, solicitors of the treasury and attorneys general of the United States, the congressional debates, and the various abortive agreements entered into by the departments with a view to settle the question. It would be the history of litigation and claim diligently pursued for three and thirty years; and which at last, by opinions and agreements, verdicts and legislation, had knotted and tied itself into such a complication of tangles, that it seemed past the possibility of any ordinary process of justice ever to unfold and draw it straight. And when it was remembered that opinions of directly opposite conclusion on the title, had been given by Messrs. Rodney and Geo. Read of Delaware, by Messrs. Richard Stockton, McIlvaine, Southard, G. D. Wall and J. S. Green of New Jersey, by Mr. Willis Hall of New York, by Messrs. Penrose and Gilpin, solicitors of the treasury, and finally by Messrs. B. F. Butler and Légaré, attorneys general of the United States, it was not wonderful that both congress and claimant should nearly give over in despair, all hopes of coming to any satisfactory conclusion; that the petitioner should have been weary of invoking the attention of congress, and that congress should have been impatient in listening to the prayers of the petitioner!

In this state of long protracted litigation and treaty, on the 8th of August, 1846, when the Oregon boundary had lately been giving to our relations with Great Britain a mena-

[2] Hon. G. D. Wall, D. A. U. S. for New Jersey, J. S. Green, Esq., holding at a later date, the same office, and Mr. B. F. Butler, A. G. U. S., had all given opinions in favour of the right of Mr. Humphrey, claiming under the state of New Jersey.

cing aspect, congress passed an act [9 Stat. 67], authorizing the president of the United States "to take such steps as he may deem advisable for adjusting the title to the Pea Patch Island." In pursuance of this authority, communications were had between the president, in behalf of the United States, and the Hon. John H. Eaton, counsel of the New Jersey claimant, by which it was agreed to submit the question of the title to the arbitration of some professional gentleman, in whose ability, learning and honour both parties should have such implicit confidence, as to be willing to accept, as final and conclusive, whatever award he might make upon the question. Mr. Eaton having nominated to the president four gentlemen of this character from the District of Columbia, the states of Maryland, Pennsylvania, and New York, President Polk made choice of the Honourable John Sergeant of Pennsylvania, one of the persons named; a selection which was at once responded to by the other side as eminently acceptable. Accordingly on the 27th February, 1847, articles of agreement under seal were concluded between the Hon. W. L. Marcy, secretary of war of the United States, acting with the approbation of the president of the United States, of the one part, and James Humphrey, in whom Dr. Gale's title had become vested, of the other, by which they mutually appointed John Sergeant, Esquire, of Philadelphia sole arbitrator, with full power and authority, at such times and places as he might appoint, to examine witnesses and receive evidence according to the rules of law and equity, and to decide the question of the title to the said Pea Patch Island, as derived by the United States from the state of Delaware and by the said James Humphrey, claiming through Henry Gale, deceased, from the state of New Jersey. His decision and award made in writing to be final and conclusive.

The matter being one to which publick attention in Eastern Pennsylvania, in New Jersey and Delaware had long been directed, Mr. Sergeant readily complied with the wish, very generally existing, that the case should be heard publickly; and the county of Philadelphia having offered to the arbitrator its principal judicial chamber, and the city of Philadelphia having likewise placed at his disposal the hall in which Independence was declared, the case, which occupied twenty-one days in the trial, was heard partly in the former room and partly in the latter, to which it was found convenient after a certain time to adjourn. The United States, were represented by special counsel, to wit, the Honourable John M. Clayton of Delaware, formerly chief justice of that state, and now its representative in the senate of the United States, and by James A. Bayard, Esq., of the same state, formerly district attorney of Delaware, for the United States. Mr. James Humphrey was represented by the Honourable George M. Bibb of Kentucky, successively a judge, chief justice and chancellor of that state, also, at one time, its representative in the senate of the United States, and more lately the secretary of the treasury of the United States under President Tyler: and by the Honourable John H. Eaton, of Tennessee, secretary at war under President Jackson, and subsequently minister plenipotentiary of the United States at the court of Spain. The case was learnedly and deliberately argued on both sides; and Mr. Sergeant, after taking several weeks consideration of it, having delivered a written opinion setting forth very fully the grounds of his award, it has been thought worth while thus to preserve some record of the proceeding. Of the value of the opinion, the reporter cannot speak more appropriately than in language which he finds in a contemporaneous publication: "Mr. Sergeant's opinion it is true," said one of the journals

of Philadelphia (the North American and United States Gazette of January 17, 1848), in speaking of its delivery, "is not the judgment of a supreme court, and therefore is not authority in the technical sense of that word; but as the well reasoned opinion of a very able lawyer—whose greater distinction in his profession has made him unsolicitous about judicial station—and as having been formed after full and grave publick argument before him for many days together by other very able lawyers, it is far more authoritative than any opinion merely professional, and has all the intrinsick weight of the highest judicial opinion. It can scarcely be reversed in any case which may again involve the question of this boundary, and will take its place, of course, among the most enduring historical monuments of the states of New Jersey and Delaware.

The case as it appeared on both sides was as follows:

Title of Mr. Humphrey: On the 12th March, 1663–64, England being at that time at war with the Dutch, Charles II. by letters patent, granted in fee to his brother James, Duke of York, all that part of the main land of New England, beginning at St. Croix next adjoining New Scotland in America, &c. &c., and also all that island called Matowacks or Long Island, situate to the west of Cape Cod and the narrow higansetts, abutting upon the main land between the two rivers called Connecticut and Hudson rivers, "together also with the said river called Hudson's river, and all the lands from the west side of the Connecticut to the east side of Delaware Bay," with certain islands, and with all the lands, islands, soils, rivers, harbours, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, &c., and all other royalities, profits, commodities and hereditaments to the said islands, lands and premises belonging and appertaining, with their and every of their appurtenances, and all our estate, &c., of, in and to the said lands and premises or any part or parcel thereof, with powers of government in extenso, and to exercise them, "not only within the precincts of the said territories and islands, but also upon the seas in going and coming to and from the same," as the duke and his assigns, &c., should think "for the good of the adventurers and inhabitants there:" with further power to admit any persons "to trade and traffique unto and within the said territories and islands," and to encounter, expulse, repel and resist by force of arms, "as well by sea as by land," all persons who without the duke's leave, "should attempt to inhabit within the several precincts and limits of our said territories and islands." Leaming & S. Laws N. J. 3–8.

The object of this grant was to enable the duke to dispossess the Dutch, who were then in possession of much of New York, New Jersey and Delaware, under the name of New Netherlands.

The Duke of York on the 23d and 24th June, 1664, reciting the king's grant to him, conveyed to Lord Berkeley and Sir Geo. Carteret the territory now known as New Jersey, describing it as bounded on the east, part by the main sea, and part by Hudson's river, "and hath upon the west, Delaware bay or river:" with all rivers, fishing, &c. and all other royalties, &c. to the said lands and premises belonging or in any wise appertaining, as fully as the duke himself had them. Leaming & S. Laws N. J. 8–11.

The object of this deed was the colonization of New Jersey, and under it Berkeley and Carteret entered and colonized that state accordingly.

It is unnecessary here to recite the various mesne conveyances and undisputed early historical facts through which Mr. Humphrey formally deduced his title; or to state more than

that on the 7th November, 1743, the proprietors of West Jersey—in which portion of the state the Pea Patch Island was admitted to be, if in any—directed their surveyor to survey, &c., "600 acres of unappropriated land," any where in that division, and, on the 7th August, 1782, to survey 5000 acres of like land, in the same division: and that two persons named Hall, having acquired 126 acres of the warrant

and a half miles and about south half a point west from the Tile house at New Castle; containing one hundred and seventy-eight acres of marsh land, bank and mud flats and allowance for roads." This survey was returned on the 27th of the same month, and being approved by the council of proprietors, was recorded accordingly. At the date of this survey the Pea Patch was just visible at low water, "about

PENNSYLVANIA

MARYLAND

NEW JERSEY

Line suggested by

New Castle

Salem County

Goose Island

Pea Patch

Egg Island

Simpson's Is'd

D E L A W A R E
or
The Lower Counties.

Baldwin

DELAWARE BAY

MAP
of the
12 MILES CIRCLE

Cape Lopin

of 1782, and 52¹/₂₀ acres of that of 1743, caused a survey to be made on the 8th October, 1784, on an "island," as appeared by the return of survey, "called the Pea Patch, situate in the county of Salem, about one mile west from Finn's Point, in Penn's Neck, and is about west of the mouth of Salem creek, a little above Reedy Point; also nearly southeast and by east from Hamburgh, about two

the size of a man's hat." As the tide rose it was covered by water, and even in 1815, when the government of the United States took possession of it and embanked it, it was not unfrequently under water at high tide. In February, 1813, the title of the Halls was vested in Dr. Gale, through whom Mr. Humphrey claimed by a regular chain. On the 24th November, 1831, the Pea Patch, having become, in the

meantime, by alluvion, deposit and embankment, a large island, and entirely above the point to which the tide rises even in its highest elevation, the state of New Jersey passed an act of assembly, "vesting in Henry Gale, his heirs and assigns, all the right and title of the state of New Jersey of. in and to an island called the Pea Patch, situate in the river Delaware, in the county of Salem, and state of New Jersey." The act after reciting that "it hath been suggested that the state of New Jersey hath some title" to the island, and that by reason thereof doubts have arisen concerning the title of the said Henry Gale, enacts that "all the right and title of the said state of New Jersey to the said island called the Pea Patch, situate in the river Delaware, in the township of Lower Penn's Neck, in the county of Salem, in the state of New Jersey," &c., as mentioned in the original survey of the island, be granted and conveyed to the said H. G., his heirs and assigns, and be vested in him and them "in as full and ample a manner as the state of New Jersey hath right and title to grant and convey the same," reserving jurisdiction and sovereignty, &c. 2 Harrison's Laws N. J. 366.

In order to show that the deeds from the king and duke had always been considered and acted upon from early times as not limiting the state of New Jersey to low water mark in the Delaware bay and river, or at any rate that the state had never been so bounded de facto, Mr. Humphrey's counsel adduced several statutes and publick facts and records of that state, as follows:

March 3, 1676, the proprietaries of West New Jersey—William Penn himself being one of them—by certain articles of concession and agreement, which constituted a sort of charter or fundamental law, grant convenient portions of lands for wharves, keys and harbours; and that all lands laid out for the said purposes shall be exempt from taxes; and that the inhabitants of the province have free passage through or by any seas, bounds, creeks, rivers, rivulets in the said province, through or by which they must necessarily pass to come from the main ocean to any part of the province aforesaid. And, further, that all the inhabitants within the said province have liberty of fishing in Delaware river. Leaming & S. Laws N. J. 390; also, to the same effect, Id. 409.

In 1679 and 1680, Sir Edmund Andros, the governour for the Duke of York, of the colony of New York, which had been conveyed (inter alia with New Jersey) to the duke, by King Charles II. imposed a duty of ten per cent. upon all European goods imported into the Delaware, which was collected at the Hoar Kills, or Lewistown, as it is now called. But it was discontinued at the instance of the proprietors of New Jersey, who, in their remonstrance, insist that they have a right to land any where in the Delaware Bay, as the bounds of the country they bought; that the right of colonizing was part of their bargain; that they bought the soil and right of government together; and that the powers of government limited them to erect no polity contrary to the laws of England; and that, with this restriction, they had the right of making laws for the good of the adventurer and planter; that if the duke claims it by the jus regale, that power over the territory constituting New Jersey is vested in his alienees. Smith, Hist. N. J. 116.

In 1682, the legislature of New Jersey resolved that the land and government of West New Jersey were purchased together. Smith, Hist. N. J. 163.

On the 3d October, 1693, the assembly of West New Jersey passed an act reciting that the whalery in Delaware Bay has been in so great a measure invaded by strangers and foreigners, that the greatest part of the oil, &c., got by that employ, has been exported out of

the province, &c.; and enacting that all persons not residing within the precincts of this province, or within the province of Pennsylvania, who shall kill or bring on shore any whale or whales "within Delaware Bay or elsewhere within the boundaries of this government," shall pay one-tenth of the oil, &c. to the governour, &c. Leaming & S. Laws N. J. 519.

In 1701 or 1702, the proprietors of East New Jersey, treating with the lords of the council of trade and foreign plantations about a surrender to the crown, of the powers of government of the state, which was then contemplated, request the king to confirm to them certain rights and privileges, among which is that of having all "wrecks and royal fish that shall be forfeited, found or taken within East New Jersey or by the inhabitants thereof, within the seas adjacent" (Leaming & S. Laws N. J. 588, 590, 591), as they had the same under a then existing grant. Though the answer of the commissioners does not give them a fully satisfactory answer, it does not deny that these rights and privileges were then lawfully enjoyed by the proprietors (Id. 596).

On the 23d August, 1725, the legislature of New Jersey passed a revenue act, laying taxes upon eight different ferries along the Delaware river, from Trenton to Gloucester across to the other shore: and for the effectual compelling of the said boats, flats or wherries belonging to the neighbouring colonies to pay such taxes as aforesaid, it enacts that "all boats, flats or wherries, that carry goods or passengers for hire as aforesaid, that shall not first pay unto the collector of his majesty's customs, &c. and get a certificate that he has paid the tax aforesaid, shall forfeit for every offence," &c. Wm. Bradford's Laws N. J. 1717, pp. 129, 130.

In 1765, the legislature of New Jersey passed "An act to regulate the method of taking fish in the river Delaware, and to prevent obstructions in the navigation thereof, and for other purposes therein mentioned." This act, which was limited to five years, and was to be dependent for its force upon the passage of a similar act by Pennsylvania, was revived conditionally, with a supplement to it passed in 1768, in the year 1771. Allinson's Laws N. J. 279, 313, 367. Pennsylvania did not pass any similar act, and the act of New Jersey not having become operative, nothing beyond its title is given in the volume referred to.

On the 21st December, 1771, the same legislature passed "An act declaring the river Delaware a common highway, and for improving the navigation in the said river." Allinson's Laws N. J. 347. It recites that the improving the navigation on rivers is of great importance to trade and commerce; that the river Delaware may be rendered much more navigable than it now is; that many persons. desirous to promote the publick welfare, had subscribed large sums of money for the purpose aforesaid, and that it was represented others will do the same if commissioners are appointed to receive subscriptions. It then enacts "that the river Delaware shall be and it hereby is declared to be a common highway for the purposes of navigation up and down the same." It then appoints commissioners to collect subscriptions, and "so much of the said moneys as may be necessary for that purpose, to lay out and apply for, and towards improving the navigation in the said river Delaware, from the lower part of the falls near Trenton, to the river Lehigh at Easton: and the residue thereof to lay out and apply for and towards improving the navigation in that part of the said river, above the said river Lehigh." It next enacts (section 3) that the commissioners, &c., shall have "full power and authority to clear, scour, open, enlarge, straighten, or deepen the said river, wherever it shall to them appear useful for improving the channels; and also to remove any obstructions whatsoever, either natural or artificial, which may or can in any manner hinder or impede

the navigation in the said river: and to make and set up in the said river any dams, pens for water-locks, or any other works whatsoever, and the same to alter and repair as they shall think fit: and also to appoint, set out and make near the said river, paths or ways, which shall be free and open for all persons having occasion to use the same for towing, hauling or drawing any vessels, boats, small craft and rafts of any kind whatsoever; and from time to time to do and execute every other matter or thing necessary or convenient for improving the navigation in the said river." It afterwards (section 5) "makes it penal to hinder the commissioners or to obstruct the navigation of the river:" and, by section 6, that "every offence committed in or on the said river, against this act, shall be laid to be committed, and may be tried and determined as aforesaid in any of the counties opposite to or joining on that part of the said river, on which such offence shall be committed."

On the 28th November, 1822 the legislature of New Jersey passed an act relative to certain of its boundaries, in which it was enacted that the west boundary of certain counties, including Salem county, in which the Pea Patch was said to be, should be "the main ship channel of the river Delaware." 2 Harrison's Laws N. J. 39, § 4.

On the other hand, there were certain publick acts of New Jersey which looked as if the state had considered that its west boundary came but to low water mark in the river.

Thus, in 1674 and in 1680, New Jersey having been conquered by the Dutch since the deeds of the Duke of York, 23d and 24th June, 1664, and restored again to England—the duke, by two new deeds, made after a regrant by the crown to him, and with a view, it is probable, to prevent any question of title, regrants the same territory previously granted, describing it on its west boundary, not as in the former deed, as "having on the west, Delaware river," but, in one deed, as extending "along," and, in another, as running "up" the Delaware. Leaming & S. Laws N. J. 47, 414.

So in February, 1681, the commissioners for settling and regulating lands in West Jersey agree, with the approbation of the governor and council, that the surveyor shall measure the front of the river Delaware, beginning at Assispink creek, (a creek which empties into the Delaware at Trenton,) and "from thence down to Cape May," and that every ten proprietors shall have their proportion of front "to the river." Leaming & S. Laws N. J. 436.

So in July, 1683, the assembly of West Jersey enact that the proprietary of the province of Pennsylvania be treated with in reference to the rights and privileges of this province "to or in the river Delaware." Leaming & S. Laws N. J. 480.

So on the 21st January, 1709, the general assembly of New Jersey passed "An act for dividing and ascertaining the boundaries of all the counties in this province;" which recites that by the uncertainty of the boundaries of the counties of the province, great inconveniences have arisen, so that the respective officers of most of those counties cannot know the limits of them: For preventing which in time to come, and the better ascertaining the boundaries, it enacts, &c. (after having settled the boundaries of other counties as running "to" or "by" or "up" or "down" the Delaware bay or river,) that Salem county begins "at the mouth" of a certain creek which empties into Delaware Bay. The act then carries the boundary round by that creek and certain lines "to Delaware river, then down Delaware river and bay to the place of beginning." [3] It is to be remarked, however, that where counties are divided by creeks

or rivers, this act frequently brings the boundaries of such counties only to those creeks or rivers on both sides, without extending the boundary into the stream; so that many of those creeks and rivers were left beyond any county jurisdiction whatever, until that matter was changed by an act of March 7, 1797, "declaring the jurisdiction of the several counties in this state, which are divided by rivers, creeks, bays, highways or roads." Id. 180.

On the 26th April, 1783, commissioners having been appointed by Pennsylvania, for the purpose of settling the jurisdiction of the river Delaware and islands within the same, New Jersey made an agreement, regulating the jurisdiction, &c., and treating the rights of the two states in the river as about equal, down to the upper portion of the twelve miles circle; which agreement was soon after ratified (by New Jersey, May 27, 1783; by Pennsylvania, September 20, 1783, Id. 41) by these two states and has regulated the matter ever since.

Title of the United States: At the date of the letters patent of March 12, 1663-64, already mentioned, from Charles II. to the Duke of York, the Dutch were in actual possession of New York, a portion of New Jersey and much of both sides, and particularly of the west side of Delaware bay and river; all which they held under the name of New Netherlands. To put the Duke of York in possession of his newly acquired estates, an English fleet was sent out under the command of Col. Richard Nicolls, who styles himself "principal commissioner for his majesty in New England, governor general under his royal highness, James Duke of York and Albany, &c., of all his territories in America and commander in chief of all the forces employed by his majesty to reduce the Dutch nation and all their usurped lands and plantations under his majesty's obedience." [4] The Dutch surrendered New York, August, 1664, and within a week afterwards Col. Nicolls sent Sir Robert Carre round into Delaware bay and river, to dispossess the Dutch there. 1 Hazzard, Pa. Reg. 37. This Dutch settlement appears to have been an appendage to the government of New York, or Manhattans, as it was then called, from which it originally sprung, and to which, as a superintending and protecting power, it appears to have constantly referred. Thus the original Dutch purchase of Delaware from the Indians in June, 1620, was concluded by the Indians in person at New York, and recorded there. 4 Hazzard, Pa. Reg. 82. So when the Swedes began to build a fort on the Delaware, about the year 1638, the director general of the New Netherlands, resident at New York, and appointed by the states general, advertises the Swedish commander, that the "whole South river has been many years in our possession, and above and below settled by our forts and also sealed by our blood." Id. So in 1646, the director general, allowed certain persons to settle upon the South river, on condition that they acknowledge the director and his council "for their lords and patrons," and submit to all taxes which they have laid or may lay. Id. 119. And there was produced before the arbitrator, ancient records of five Dutch patents for lands in Delaware, emanating from Governour Stuyvesant at New York, between the years 1664 and 1665, and recorded there (Id. 119, 120), which titles, Mr. Clayton informed the arbitrator, are recognized as valid in Delaware up to this day. Other Dutch records from New York shewed that in 1665 instructions were issued from the director general there, "for the vice director in the South

[3] Statutes of New Jersey Revised and Published under the Authority of the Legislature. Trenton: Printed by Phillips & Boswell, 1847, p. 161.

[4] A. D. 1667; 4 Hazzard, Pa. Reg. 74. Several of the documents of which evidence was given on the trial, are found in this valuable repository; but more legal evidence of them was given before the arbitrator. Ancient records were produced, being the identical ones, apparently, which were given in evidence before Lord Hardwicke in 1750, on the hearing of Penns v. Ld. Baltimore. 1 Ves. Sr. 444.

river and the commissioners joined with them," in which minute directions are given as to the places in which lands are to be granted and streets laid out there (Id. 82), with various other instructions shewing that that district had a very close and depending relation upon the government at New York as a principal.

In this condition of things, the Delaware country apparently stood in regard to the Dutch government at New York, when the latter surrendered to the English: And with the surrender of the principal government at New York, Sir Robert Carre had no difficulty, on the 1st October, 1664, in procuring a surrender of the settlement on the Delaware.

New York continued to be, under the English, as it had been under the Dutch, the seat of principal government; the English governours there, acting under a sort of double or mixed authority derived partly from the king and partly from the Duke of York. A variety of commissions and other publick documents, for example, were produced from Col. Nicolls, and other English governours there, granting lands in Delaware, constituting justices there, appointing collectors of customs, and doing various publick acts not necessary to be stated. In eight of them, including several grants of land,[5] there was no recital of the authority under which the act professed to be done. In ten others, being most of them commissions to judicial office, there was a reference to "his majesty's service," or to power derived from "his majesty;" the act being sometimes done in "his majesty's name." In eleven others—including a grant of land, of which however the rent was reserved to the king—the power under which the act was done professed to be derived from the Duke of York. Two others recited a joint or double authority; being "by virtue of his majesty's letters patent, and the commission and authority given unto me by his royal highness." And a third one, a proclamation by Governour Andros, one of the British governours—on the re-conquest of New York from the Dutch—went as follows: "Whereas, it hath pleased his majesty and his royal highness, to send me with authority to receive this place and government, and to continue in command thereof under his royal highness, who hath given me his command for securing the rights and properties of the inhabitants, and that I should endeavour by all fitting means the good and welfare of this province and dependencies under his government, &c." 4 Hazzard, Pa. Reg. 55–57, 73–75, 81, 82. So again, when the Delaware country surrendered to Sir Robert Carre, Oct. 1, 1664, protection was to be afforded to all who "shall take the oath of allegiance to his majesty:" While in directions from Gov. Nicolls and his council at New York, in 1668, "for the better settlement of the government on the Delaware," the newly appointed counsellors are to take the oaths to his royal highness; whose laws as established by him, are ordered to be shewed and frequently communicated to them, the said counsellors, and others.". Id. 37, 38. A fact is also mentioned by the arbitrator in his opinion, as illustrative of some title in the duke, to wit, that after Mr. Penn, March 4, 1680–81, had obtained letters patent from Charles II. for the province of Pennsylvania, he took a release, August 21, 1682, from the Duke of York for the same premises.

But notwithstanding the great research of the counsel of the United States, aided by several other persons connected with historical societies and curious in archæology—whom the interest of the case had induced to study it—nothing precise was shewn as to the source from which the duke claimed to derive the power which it was in evidence that he actually exercised over the district now known as Delaware. Whether the duke was under the same mistake as Lord Baltimore, who, as late as 1737, in his answer to the bill of Penns v. Baltimore, swears that country is "on the east side" of the bay; which would have brought it strictly within the terms of the king's patent of March 12, 1663–4: Whether—taken in connection with the known object of the grant, which was the dispossession of the Dutch from all this region—he supposed that it passed under the clause of the patent, which gave him power to encounter and expulse, as well by sea as by land, any persons who should attempt to "inhabit within the several precincts and limits" of the territories granted with full appurtenances and with power to govern them: Whether he thought that the Dutch settlement on the Delaware, having been at all times, and at the very date of the conquest of New York, a part, "appendix," and dependency of that latter place, necessarily followed its course and fortune, and so passed into his hands by the terms of his patent, which gave him New York, and all powers of government over the country conveyed and all its appurtenances: Whether there might have been something, in some commission, or some instructions from the king to the English commander, which two centuries now rose up to hide from view, and by which a title by conquest might have enured to the duke and not to the crown: Whether the duke considered that he had no title in law, and took possession only as a successful conqueror, meaning to procure or make at some future time, a confirmation of what he did: Or whether, finally, he exercised the more usual privilege of royal and noble blood, and did not undergo the fatigue of thinking any thing about the subject: This was all matter on which speculation might exercise its ingenuity, but on which the case itself exhibited no direct evidence.[6]

However, possessing either a good title, an imperfect one, or no title at all, the Duke of York did, on the 24th of August, 1682, by a deed of feoffment with livery of seizin, convey to William Penn, in fee, "all that the town of New Castle, otherwise called Delaware, and all that tract of land lying within the compass or circle of twelve miles about the same, situate, lying and being upon the river Delaware, in America; and all the islands in the said river Delaware, and the said river and soil thereof,

---

[5] In the Breviate, p. 42, mentioned post, there is a very long list of grants of land in Delaware, made by the English governors. These were referred to generally by the United States, but they are imperfect abstracts of the patents, and not material to be here copied.

[6] It would appear probable that no very precise notion was had by the duke himself or his governours, perhaps, as to the nature and extent of his right here: but Sir John Werden, his intelligent secretary, seems to have regarded it as a sort of pre-emption right rather than as a perfect title. When Mr. Penn was applying for a grant of Pennsylvania, the board of trade on the 14th June, 1680, refer his petition, before acting on it, to Sir John Werden, to know whether such a grant as Mr. Penn wanted, "would any way intrench upon the patent of his royal highness or otherwise prejudice the same." Sir John replies: "By all which I can observe of the boundaries mentioned in Mr. Penn's petition, they agree well enough with that colony or plantation which hath been hitherto (ever since the conquest of New York by Col. Nicolls,) held as an appendix and part of the government of New York, by the name of Delaware colony, or more particularly New Castle colony, that being the name of a principal place in it; the whole being planted promiscuously by Swedes, Finlanders, Dutch, and English; all which hath been actually under the government of his royal highness' lieutenants at New York hitherto. But what are its proper boundaries, (those of latitude and longitude being very little known, or so ill observed, as experience tells us in all the West Indies,) I am not able to say. If this be what Mr. Penn would have, I presume the right honourable the lords of the committee for trade and plantations, will not encourage his pretensions to it, because of what is mentioned, which plainly shew the duke's right preferable to all others (under his majesty's good liking) though it should not prove to be strictly within the limits of the duke's patent; but if it be, &c. &c." Letter of June 23, 1680. 1 Hazzard, Pa. Reg. 274.

lying north of the southernmost part of the said circle of twelve miles about the said town, together with all rents, services, royalties, franchises, duties, jurisdictions," &c. &c. and all the estates, &c. "to have and to hold the said town and circle of twelve miles of land about the same, islands, and all other the before mentioned," &c. &c. The duke for himself, his heirs and assigns, then covenants and grants with. and to Penn, his heirs and assigns, that he or they will, any time within seven years from the date of the deed, "do, make, execute or cause to be made, done, executed, all and every such further act and acts, conveyances and assurances in the law whatsoever, for the further conveying and assuring the said town and circle of twelve miles of land about the same, and islands and all other the premises with the appurtenances" to Penn in fee: after which he constitutes John Moll and Ephraim Herman, "jointly and either of them severally," his attorneys, and so gives them full powers for him and in his name and stead to enter into the premises granted, and every part of them, and to take quiet and peaceable possession or seizin of them, or any part or parcel in the name of the whole: And after taking such quiet and peaceable possession and seizin, to deliver the same to William Penn, his heirs and assigns, or to his and their lawful attorney. Ratifying, approving, &c.[7]

The duke, on the same day, by a second deed of feoffment with livery of seizin, conveyed to William Penn, in fee, "all that tract of land upon Delaware river and bay, beginning twelve miles south from the town of New Castle, otherwise called Delaware, and extending south to the Hoar Kills, otherwise called Cape Henlopen, together with free and undisturbed use and passage into and out of all harbours, bays, waters, rivers, isles and inlets, belonging to or leading to the same; together with the soil, fields, woods, underwoods, mountains, hills, fens, isles, lakes, rivers, rivulets, bays and inlets situate in, or belonging unto the limits and bounds aforesaid, together with all sorts of minerals, and all the estate, interest, royalties, franchises, powers, privileges and immunities whatsoever of his said royal highness therein or in or unto any part or parcel thereof." Then there was a covenant for further assurance, and an appointment of Moll and Herman to be attorneys to deliver possession and seizin to Penn exactly as in the former deed.

It further appeared from an ancient record in the rolls office at Philadelphia, made 28th August, 1701, that on the 28th of October, 1682, as they certify under their hands and seals, Arnoldus de La Grange and eleven other persons, "being inhabitants of the town of New Castle upon Delaware river, having heard the indenture read, made between his royal highness. James Duke of York and Albany, &c., and William Penn, Esq., governour and proprietor of the province of Pennsylvania, &c., wherein the said duke transferreth his right and title to New Castle and twelve miles circle about the same, with all powers and jurisdictions and services thereunto belonging unto the said William Penn, and having seen by the said duke's appointed attorneys, John Moll and Ephraim Herman, both of New Castle, possession given, and by our Governour William Penn, Esq., possession taken, whereby we," says the record, "are made subjects under the king to the said William Penn, Esq.: We do hereby, in the presence of God, solemnly promise to yield him all just obedience, and to live quietly and peaceably under his government."

It appeared further from an ancient record, made at the same time, in the same office, that the same Arnoldus de La Grange and eight other persons made a memorandum under their hands, October 28, 1682, that on that day and year "William Penn, Esq., by virtue of an instrument of indenture, signed and sealed by his royal highness, James Duke of York, &c., did then and there demand possession and seizin of John Moll, Esq., and Ephraim Herman, gentlemen (attorneys constituted by his said royal highness), of the town of New Castle, otherwise called Delaware, with twelve miles circle or compass of the said town: that the possession and seizin was accordingly given by the said attorneys to the said William Penn, according to the usual form, by delivery of the fort of the said town, and leaving the said William Penn in quiet and peaceable possession thereof, and also by the delivery of turf and twig, and water and fowl of the river Delaware, and that the said William Penn remained in the peaceable possession of the premises."

Next an ancient record, made at the same time and place, the original of which was made in Delaware river, under the hands of Luke Wattson and ten other persons, November 7, 1682, which, after reciting the duke's deed to William Penn for the territory beginning twelve miles south from the town of New Castle, the power of attorney to Moll and Herman, and that Mr. Penn had substituted Captain William Markham, as attorney to receive seizin for him of that said tract, proceeds to testify and declare that livery of seizin was delivered of it also; that the persons whose names are subscribed to the document, on the day of the date thereof, "have been present and seen, that they the said John Moll and Ephraim Herman, in pursuance of his royal highness' command, and by virtue of the power given them by his said royal highness, James Duke of York and Albany, etc., by and in the above mentioned instrument of indenture, bearing date as above, have given and delivered actual possession unto the said Captain William Markham, to the sole use and behoof of the said William Penn, (of part in the name of the whole,) of the land, soil and premises in the said instrument of indenture mentioned, and according to the true intent and meaning of his said royal highness mentioned in the same."

Next came another ancient record, without date, however, from the office for recording of deeds, &c., at New Castle, Delaware; being an account by John Moll, himself, one of the persons named in the duke's deeds as attorneys for delivering seizin of both tracts to Mr. Penn, of the mode in which he did this duty. As this quaint document has not perhaps been in print, and may not be without interest to the historian, it is here inserted in the same form in which it was given in evidence.

"These are to certify all whom it may concern that William Penn Esqr. Proprietor and Govr. of the provinces of Pennsylvania and the territories thereunto belonging at his first arrival from England by the Town of New Castle upon Dellaware River in the month of October anno 1682 did send then and there our messenger ashoar to give notice to the Commissioners of his desire to speak with them aboard (I being then left the first in Commission by Sr. Edmund Andross Governour Genl. under his Royal highness James Duke of York and Albany etc. of all his Territorys in America) did go aboard with some more of the commissioners att which time Esqr. Penn did show me two sundry Indentures or Deeds of Enfeoftment from under the hand and seal of his Royall Highness granted unto him, both bearing date the 28th day of August Anno 1682 the one for the county of New Castle with twelve miles distance North and South thereunto belonging and the other beginning twelve miles

---

[7] There were produced two original leases for 10,000 years from the duke to Wm. Penn, his executors, &c. one dated Aug. 21, 1682, but not sealed or delivered in the presence of witnesses; another just like it only sealed and delivered, and dated three days after it, Aug. 24, 1682. The descriptions in both were the same as in the deed of feoffment. There was also a similar lease, 24th August, 1682, for the country south of the circle.

below New Castle and extending South unto Cape Henlopen together with the mills and waters of the said River, Bay, Rivulets and the Islands thereunto belonging &c. underneath both which sd. Indentures of deeds of Infeoftment were added his Royall highness letters of attorney directed unto me and Ephraim Herman deceased with full power and authority for to give in his Royall highnesses name unto the sd. William Penn Esqr quiet and peaceable possession of all what was Inserted in the sd. Indentures as above briefly is specified. But the sd. Eph. Herman happened to be gone from home so that he was not at that time aboard with me of the sd. ship, I therefore did desire from Esqr Penn four and twenty hours consideration for to communicate with the sd Herman and the rest of the Commissioners about the premises. In. which compass of time we did unanimously agree to comply with his Royal Highnesses orders whereupon by virtue of the power given unto us by the above mentioned letters of Attorney We did give and surrender in the name of his Royall Highness unto him the said William Penn Esq actual and peaceable possession of the fort of New Castle by giving him the key thereof to lock upon himself alone the door which being opened by him again We did deliver allso unto him one turf with a twigg upon it a porringer with River water and Soyle in part of all what was specified in the sd. Indenture or Deed of Infeoftment from his Royal Highness and according to the true intent and meaning thereof. And few days after that we went to the house of Capt. Edmund Caulwell at the south side of Appoqueniming Creek by Computation above twelve miles distance from the Town of New Castle as being part of the two Lower Countys here above mentioned and specified in his Royal Highnesses other Indenture or Deed of Infeoftment and after we had shown unto the Commissioners of these Countys the power and orders given unto us as aforesaid we asked them if they could show us any cause why and wherefore we should not proceed to act and do there as we had done at New Castle, and finding no manner of obstruction We made then and there in his Royal Highnesses name the same manner and form of delivery as we had done at New Castle Which acting of us was fully accepted and well approved off by Anthony Brockhold then Commander in chief and his Councill at New York as appears by their Declaration bearing date the 21st of November 1682, from which Jurisdiction we had our Dependance all along ever since the Conquest untill we had made the above related delivery unto Governour William Penn by virtue of his Royall highnesses orders and Commands &c.

"Jno. Moll."

The declaration of November 21, 1682, referred to in the foregoing certificate, was a circular letter (3 Hazzard, Pa. Reg. 34) by Captain Brockhold, &c., to the several justices of the peace, magistrates and other officers of Delaware, which, after reciting the two deeds of August 24th from the Duke of York to William Penn,—mentioning one of them as granting "all that town of New Castle otherwise called Delaware, and all that tract of land lying within the compass or circle of twelve miles about the same, with all islands and the river and soil thereof lying north of the southernmost part of the said circle,"—which deeds are spoken of as having been "here produced and shewn to us, and by us well approved and entered in the publick records of this province." —proceeds to say that "we being fully satisfied of the said William Penn's right to the possession and enjoyment of the premises, have therefore thought fit and necessary to signify and declare the same to you to prevent any doubt or trouble that might arise or accrue, and to give you your thanks for your good services done in your several offices and stations during the time you remained under his royal highness' govern-

ment. Expecting no further account than that you readily submit and yield all due obedience and conformity to the powers granted to the said William Penn in and by the said indenture, in the performance and enjoyment of which we wish you all happiness."

So far as to the title derived to Mr. Penn from the grants of 24th August, 1682, prior to certain letters patent now to be mentioned, from King Charles II. not to Mr. Penn—but to the Duke of York—granting, March 22, 1683, to him, the same property which the duke had granted about seven months before to Mr. Penn. 2 Hazzard, Pa. Reg. 27. The letters patent describe the territory as "all that the town of New Castle otherwise called Delaware, and fort therein or thereunto belonging, situate, lying and being between Maryland and New Jersey, in America. And all that tract of land lying within the compass or circle of twelve miles about the said town, situate, lying and being upon the river of Delaware. And all islands in the said river of Delaware. And the said river and soil thereof, lying north of the southernmost part of the said circle of twelve miles about the said town. And all that tract of land upon Delaware river and bay, beginning twelve miles south from the said town of New Castle otherwise called Delaware, and extending south to Cape Lopin. Together with all the lands, islands, soil, rivers, harbours, mines, mineral, quarries, woods, marshes, waters, lakes, fishings, hawkings, huntings, and fowlings, and other royalties, privileges, profits, commodities and hereditaments to the said town, fort, tracts of land, islands and premises, or to any or either of them belonging or appertaining, with their and every of their appurtenances, situate, lying and being in America. And all our estate, right, title, interest, benefit, advantage, claim and demand whatsoever, of, in or to the said town, fort, lands or premises, or any part or parcel thereof. And the reversion and reversions, remainder and remainders thereof, together with the yearly and other rents, revenues and profits of the premises and of every part and parcel thereof. To have and to hold the said town of New Castle otherwise called Delaware, and fort, and all and singular the said lands and premises, with their and every of their appurtenances hereby given and granted, or hereinbefore mentioned to be given and granted, unto," &c.

These letters patent gave powers of government in the same way as those of March 12, 1683–84, to which, except in the description of the property granted, their language almost exactly conformed.

The original of this patent from the king to the duke [8] for Delaware, and of the Duke of York's grant to Penn for the twelve miles circle were produced before the arbitrator; having both, with the original charter of Pennsylvania and two leases of August 24th to Mr. Penn. mentioned ante, p. 1129. note, been brought to Philadelphia, about the year 1834, by Mr. Coates of that city, an agent of the estates in Pennsylvania belonging to Mr. Penn's descendants in England. Mr. Coates got possession of them on a visit to his principals in England. Being at their seat of Stoke Pogis, he was shewn by them into the charter-room of their house, where he was told that he might find some old deeds &c. that would interest him as an American, and to which he was welcome. Happening to find the patents and deeds just mentioned, he brought them to Philadelphia, where those relating to Delaware still were, on the hearing of this case.

It appeared also, by an original "Breviate" of the Hon. Mr. Murray, A. G. and Sir Dud-

[8] Besides the original, there was, (1) an exemplification from the Rolls in England under the great seal, July 16 (6 Vict.); (2) a copy sworn to before the Lord Mayor of London, Feb. 4, 1735; (3) a printed copy in The Pennsylvania Votes of Assembly, published in 1754. Volume 3, p. 590.

ley Ryder, S. G. solicitors for the sons of William Penn in their suit with Lord Baltimore—(1 Ves. Sr. 444) before Lord Hardwicke, A. D. 1750; the bill was filed June 21, 1735—that these identical parchment letters patent were in evidence before Lord Hardwicke in that case as the complainants' exhibit. And were put in evidence by them to shew their possession of them, and so repel an objection of Lord Baltimore's, that "the duke obtained this grant for himself and not for Mr. Penn, and never made any subsequent conveyance to Mr. Penn." Breviate.

The counsel of the United States, in order to shew that the title of the Penns as thus derived, had been subsequently recognized and confirmed by the crown, and had been asserted also by the state of Delaware just at the time of the American Revolution, then referred to certain facts of history as follows:

Penn was the intimate friend of James II. and in favour at the English court until the accession of William and Mary. In 1692 his government in America was taken from him, and Benjamin Fletcher appointed in his place. Fletcher gave dissatisfaction, and Penn was restored to his government again, in 1694, by letters from William and Mary. 1 Proud's Hist. Pa. 377, 403.

Charles I. having granted to Lord Baltimore in 1632, a tract of land between the Chesapeake and Delaware Bays, a dispute arose between Penn and him as to the extent of the king's grant and the situation of the line between them. Lord Baltimore's grant, reciting that the earl, being desirous to extend the Christian religion as well as the English empire to certain parts of America, hitherto savage, and inhabited by people having no knowledge of the Divine Being, had asked the king for that region—gave to him all the country being between the Chesapeake and Delaware Bays. An application having been made to the crown for a grant to the Duke of York, "of the parts adjacent to the Delaware Bay," Lord Baltimore, by his agent Mr. Burk, applied, May 21st, 1683, praying that the grant might not pass until the king should be satisfied as to the extent of the grant already made to the earl. The minute then proceeds (1 Votes Pa. Assem. xiv), May 30, 1683: "Counsel learned, in behalf of his royal highness, together with an agent from Mr. Penn, who solicits the passing of this grant; as also the petitioner, Mr. Burk, and his counsel learned, are called in: whereupon the counsel for my Lord Baltimore, affirming that the tract of land in question, lies within the limits of the charter granted to the Lord Baltimore, and that his lordship has always continued his claim thereunto; Mr. Penn's agent, and the counsel in behalf of his royal highness, endeavoured to make out, that the territory was never possessed by my Lord Baltimore, but originally inhabited by Dutch and Swedes; and that the grant to my Lord Baltimore, was only of lands not inhabited by Christians; so that a surrender having been made to his majesty in 1664, the Lord Baltimore can have no rightful claim thereunto; and that it having been ever since in the possession of his royal highness, the Lord Baltimore can receive no injury by the grant that is desired. Upon the whole matter, Mr. Penn's agent undertaking to prove within a short time, that this country was possessed by the Dutch and Swedes, in the year 1609, or at least before the date of the Lord Baltimore's patent, their lordships agreed to meet again as soon as the proofs shall be ready for making out the same." After numerous hearings, in which it appears that the Duke of York, the earl and Mr. Penn, all took part, a final order was made November 7, 1685, as follows (1 Votes Pa. Assem. xviii): "My Lord Baltimore and Mr. Penn, attending concerning the boundaries of the country of Delaware, are called in; and being heard, their lordships resolve to report their opinion to his maj-

esty, that, for avoiding of further differences, the tract of land lying between the river and Bay of Delaware and the eastern sea on the one side, and Chesapeake Bay on the other, be divided into two equal parts, by a line from the latitude of Cape Henlopen to the fortieth degree of northern latitude; and that one-half thereof lying towards the Bay of Delaware, and the eastern sea, be adjudged to belong to his majesty, and that the other half remain to the Lord Baltimore, as comprised within his charter."

This being done, articles of agreement were concluded in 1732, between the Earl of Baltimore and the sons of William Penn, upon which the Penns, in 1735, filed their bill in chancery in England, praying for a specifick performance and the running and settlement of the boundaries. This bill set forth title in the Penns; the Duke of York's and the king's deeds, (giving their dates and the description of the property conveyed, including the river, soil, and islands north of the southernmost part of the twelve miles circle,) the delivery of seizin by Moll, the circular letter by Captain Brockhold, the covenant in the duke's deed for further assurance, and alleged that "immediately after the said last recited letters patent had passed the great seal, the said Duke of York, who was no other than a trustee for the said William Penn therein, and had obtained them in pursuance of his covenant for further assurance, did deliver over the same original last recited letters patent under the great seal to the plaintiff's father;" that after this, and when the duke was soliciting from the king a more beneficial grant for Penn, which was then preparing in order to pass the great seal, the same was stopt by Lord Baltimore, whose petition caused the matter to be referred by the king to the committee of trade and plantations, where both parties were heard for nearly two years and a half: that it is continually taken notice and expressly mentioned in the minutes made by the said committee thereon, that the dispute was a dispute between Baltimore and Penn, though the latter did sometimes use the Duke of York's name, and though the duke himself did by his counsel and other agents sometimes assist and interpose in the suit: which latter fact the Penns rely on as a manifest proof that the duke held the king's letters patent, for the benefit of Penn and not of himself. And finally, that, November 7th 1685, the committee made the adjudication already mentioned.

That notwithstanding this, Lord Baltimore in Jan. 1708, brought the matter before Queen Anne, who, after a counter-representation from Penn, dismissed the petition in the same month; that not yet satisfied, the earl, in May 1709, presented the matter again to the queen, who ordered it to be heard before her in council, where both Penn and Baltimore were heard, and where it was ordered that the earl's petition be dismissed, and that the order of November 7th 1685, be ratified and confirmed in all its points and put in execution.

The case, which is the well known case reported in 1 Ves. Sr. 444, under the name of Penn v. Lord Baltimore, was heard before Lord Hardwicke who, May 15th 1750, decreed in favour of the Penns, but "without prejudice to any prerogative, power, property, title or interest of his majesty, his heirs and successors in or to the said territories, &c." (Belt, Supp. Ves. Sr. 198), with liberty, in case the king should insist on any power, &c. for any of the parties to apply. Subsequent articles of 1760, and another chancery decree, twelve years later, terminated the dispute between the parties.

In 1767, the Penns and Lord Baltimore presented a joint petition to George III. reciting the before mentioned articles and decrees, and setting forth that the commissioners to run the line were proceeding in their work, and praying the king to give his allowance, ratification and confirmation of the articles and de-

crees already mentioned; whereupon the king, January 11, 1769, by order in council, signified his approbation of the proceedings mentioned in the petition.

On the 8th April, 1775, John Penn, then governour of Pennsylvania and Delaware, or the lower counties as they were then called, made a proclamation making known the premises, and on the 2d Sept., 1775, it was enacted by the legislature of the lower counties, in an act reciting the articles of agreement, decrees and proclamations, that certain lines which were then fixed, should be the divisional lines of the counties. The act does not profess to fix either the eastern or the western bounds of the province. 1 Booth's Laws Del. 567, 569.

The paper title of the United States was completed by an act of assembly of the state of Delaware, May 27, 1813; by which it was enacted, that "all the right, title and claim, which this state has to the jurisdiction and soil of the island in the Delaware commonly called the Pea Patch, be and the same is hereby ceded to the United States of America, for the purpose of erecting forts, batteries and fortifications for the protection of the river Delaware and the adjacent country," &c. &c. reserving jurisdiction, &c. Dig. Del. Laws (Ed. 1829) p. 673.

The same counsel, in order to show, more specifically, that absolute control over the whole river within the twelve miles circle, had been, at least, claimed from early days by the lower counties, proved that about the year 1707, a law was passed at New Castle, whereby a tax of half a pound of powder for each ton of measurement, was laid upon every vessel bound up or down the river; that the lower counties proceeded to enforce the tax by firing upon vessels which would not pay it; that although the general assembly of Pennsylvania strongly remonstrated against the matter, the law was never repealed, though its execution was stopped by defiance and resistance from Pennsylvania vessels. 1 Votes Pa. Assem. pt. 2, p. 170.

So far as to the paper title of the respective parties, as the same was proved by original deeds or early legislative action.

As to the jurisdiction exercised, de facto, in the river, it appeared on behalf of New Jersey that Egg Island, a small island low down in Delaware Bay, and Stypson's Island, whose position could not be found by counsel, but both of which were admitted to be without the circle, were held under New Jersey, though how, or for how long, did not appear. Further, that some time since 1832, a boat-man having committed an assault upon some person on the river within the circle, a constable of New Jersey pursued the criminal to the Pea Patch and arrested him. "The constable had process," that is, said the witness, a military person, "he had a pistol; he shewed no process but that." The boat-man refused to go to New Jersey, said he would go on lawful process; process from Delaware; and did not go with the constable, who went away and never came back after him. On the part of Delaware, the evidence was more full. Reedy Island and Bombay or Boonprie Hook, the only island within the circle, had always, so far as appeared, been considered as part of Delaware, to which state the people also were considered as belonging. Both these islands, however, lie close to the Delaware main land; the latter being within its profile, and separated from it only by an artificial cut or canal.

Twelve persons were examined from the state of Delaware, most of them aged, and likely, it was said, from their professions or pursuits to be acquainted with the fact of what jurisdiction generally had been exercised over the circle by Delaware, for the last seventy years or more.

Among them was the Hon. Thomas Clayton, aged seventy years and upwards, sometime a member of the legislature of Delaware, after-wards attorney general and then chief justice of that state, and more recently its representative in the senate of the United States. "It has been held," said this witness, who had resided all his life in Delaware, "it has been held, as far back as my memory goes, by the courts, publick officers, and lawyers of Delaware, that the title and jurisdiction of the state of Delaware extended to a circle of twelve miles around New Castle, to low water mark on the New Jersey shore. I never heard the title or jurisdiction of the state doubted, over that part of the river Delaware, by any one, until the claim of Doctor Gale was set up to the Pea Patch; and since that, I have heard no one in the state of Delaware, lawyer or other, doubt it. Writs have been issued by the courts of Delaware to seize vessels and persons in all parts of the river indiscriminately, within the twelve mile circle, and I never knew such a seizure to be disputed in any court of Delaware, on the ground of want of jurisdiction over all such parts of the river."

James Rogers, Esquire, sixty years old, for most of his life a resident in or near New Castle, and for twenty years attorney general of Delaware, testified as follows: "It has been uniformly considered by the courts, publick officers and lawyers of the state of Delaware, that her title and jurisdiction extended within a twelve mile circle around New Castle, to low water mark on the Jersey shore. I have never heard her title or jurisdiction over that part of the river Delaware doubted by any court, publick officer or lawyer in Delaware. I know that writs have been often issued from the courts in Delaware for New Castle county, and that by virtue of such writs, persons, vessels and cargoes have been arrested and seized within the jurisdiction above alluded to; and in no instance, within my knowledge, was the jurisdiction ever disputed, or any question made as to the jurisdiction of the state, when such persons were arrested or vessels and cargoes seized. I have in many cases caused writs to issue and persons to be arrested, and vessels and cargoes to be attached and seized upon the river Delaware, and within the aforesaid jurisdiction, and have been concerned in cases where process of attachment has been issued by other members of the bar. I recollect one case, in the supreme court,—Richards v. Dusar. I was counsel for the defendant, and every defence was set up that was considered available, but no plea to the jurisdiction was set up." (The record of this suit was attached to Mr. Rogers' deposition, and showed that four pleas had been put in.)

"With respect to lands held by warrant, survey and patent, from William Penn and his heirs, the title has been universally held as good title. It has been always held by our courts that the Penn title, under the Duke of York, was the true title to the lands and waters in Delaware, so far as my knowledge extends. I know no other title than the Penn title, a few titles held by grant from the aborigines and from the state excepted."

The Honourable James Booth, chief justice of Delaware, aged fifty-seven years, who was born in New Castle, and, with the exception of four years had resided there all his life, testified to the same effect, essentially, as to the jurisdiction, though in language more qualified than Mr. Rogers. On the subject of the Penn title he added: "There never was any doubt or question, so far as my knowledge and information extends, of the justice and legality of the Penn title, under the Duke of York, to the lands within the state of Delaware. It was always considered, in this state, the true title to the lands and waters in the state of Delaware; although I have seen on record some old title papers for lands from the aborigines of the country, and from Sir Edmund Andross, before the date of the deed from the Duke of York to William Penn. I have seen many titles in-

cepted in court by the Penn warrants, surveys, and patents, and have always understood and believed that all lands and waters in the state of Delaware, within the twelve miles circle, are held under the Penn title."

The testimony of Kensey Johns, Esquire, was particularly relied on by the counsel of the United States, as well from the venerable age to which this witness had attained, as from his most respectable understanding, attainments and character, and from the great opportunities which he had had of becoming acquainted with the subjects on which he spoke. "I was eighty-eight years and four months old," said this witness, "on the fourteenth day of last month, (October, 1847.) I reside in the town of New Castle, in the state of Delaware. I have resided here since the year 1780. My business has been a practising lawyer for twelve years; afterwards, chief justice of the supreme court of the state of Delaware for thirty-eight years: afterwards, chancellor of the state: since that time and at present living a private gentleman."

"I have known the island since the year 1780. At first it appeared about the size of a man's hat. In 1813, when the United States took possession of it, it had grown to be a large island. It was not worth a cent to any private citizen. The expense of banking would have been more than it was worth. It has always been considered and held," continued the ex-chief justice and chancellor, "by the courts, publick officers, and lawyers of Delaware, as far as my memory reaches, that the title and jurisdiction of the state of Delaware extended to a circle of twelve miles around New Castle to low water mark on the New Jersey shore. I have never heard the title and jurisdiction of the state of Delaware over that part of the river Delaware doubted by any court, publick officer, or lawyer in Delaware on any occasion whatever. Within my knowledge and remembrance, writs have been often issued out of the courts of Delaware to seize vessels and persons in all parts of the river Delaware within the circle of low water mark on the New Jersey shore; and no dispute, question, or plea was ever made or suggested, within my memory, before any court in Delaware against the title and jurisdiction of Delaware over all such parts. The state of Delaware, for the whole period of my remembrance, and as far as my researches extend, has claimed and exercised title and jurisdiction over the Delaware river and soil thereof, within the circle to low water mark on the Jersey shore, and the state has never failed to exercise this jurisdiction when called upon or asked to do so."

"The lands in Delaware generally are held under the title of William Penn and his heirs. The Penn proprietors granted title by warrant, survey, and patent. In action of trespass or ejectment, the plaintiff incepted his title by the warrant and survey. I never heard of any doubt, in the courts of Delaware, of the justice and legality of the Penn title to the lands in the state of Delaware. It has always been held as the settled maxim within the Delaware courts, that the Penn title, under the Duke of York, was the true title to the lands and waters in Delaware. I have seen a great many (I can't say how many) titles incepted in court by the Penn warrants and surveys. The lands and waters generally in Delaware within the twelve mile circle, are held under the Penn title."

In addition to the above testimony which, so far as it spoke of the circle generally, was corroborated to some extent by records, there were three or four well attested instances of process which issued from the state of Delaware having been served close upon the Jersey shore.

Mr. Thomas Janvier, aged seventy-five, a resident of New Castle, and for some years engaged in trade there, said: "It is within my memory that R. C. Dale, who was sheriff of New Castle county from 1803 to 1806, after summoning a posse, boarded a ship on her outward passage, and arrested a person on board of the ship after she had been run ashore on the Jersey side, nearly opposite the town of New Castle; the names of the parties and the minute detail of the affair, I do not now remember. About twenty-five years since, I accompanied the deputy of the sheriff of New Castle county, and with him boarded a sloop then between the Pea Patch Island and the Jersey shore, and was with the deputy sheriff when he arrested the captain of the sloop by virtue of a writ, issued out of one of the courts of Delaware. The matter was compromised with me, the captain of the sloop paying the demand; and we let him go."

Mr. Wm. Robinson, aged sixty-five, residing all his life in New Castle county, stated that about the year 1834, he "accompanied the deputy sheriff, in a boat, for the purpose of arresting a person on board a schooner that was coming down close on the Jersey shore; the deputy sheriff boarded the vessel in that situation, and arrested the captain. The matter was compromised, and the captain was discharged from the arrest, on his paying some amount of damages claimed of him for running into a sloop laying at anchor off this town."

Mr. John Steel of Philadelphia, aged sixty-seven, who kept a shop in New Castle in 1800, gave the following account of an arrest made within his knowledge: "While residing at New Castle, I had occasion, in July or August 1800, to serve process on a man who was boatswain of the United States ship Scammon. I took the advice of George Read, Esq., district attorney of the United States, a lawyer of eminence in Delaware. He told me to follow the man as far as low water mark on the Jersey shore, but no further. I went over after the man, and caught him at the end of the wharf in his boat as he was going ashore. He was outside of low water mark at the wharf. I brought him back to New Castle, and he gave me an order to the officer at Washington for his back wages. I sent this order on to Washington, and got the money for it. There were people who professed to know how to keep clear of process from Delaware; they would steer close to the Jersey shore. Our custom was, in suing people, always to take process from Delaware. We never got any from Jersey. I was on terms of intimacy with the sheriff; boarded in his house a part of the time. Our instructions were never to go beyond the Jersey low water mark. I never knew any dispute about the jurisdiction. It was the well settled opinion in them days that the jurisdiction extended to low water mark on the Jersey shore. The man whom I arrested never sued me for trespass. He had a lawyer with him; Mr. Brown, perhaps, of Philadelphia, then a young man; or it might have been a student of Mr. Bayard's."

It further appeared that one Cockrin, in the employ of the United States and residing on the Pea Patch as tenant or agent, had been regularly assessed, had paid taxes and voted from 1836 to 1847, in Red Lion hundred, New Castle county, Delaware, and that his vote had never been challenged.

Touching the position of the island in regard to "the main channel," twelve persons, river pilots or captains of small vessels, testified that the western or Delaware channel was the main channel, that it was always so considered by all navigators, "always had been and always would be," said one witness; and that large vessels almost invariably took it, whether the wind was fair or adverse. They stated, however, that when the tide was high, and the wind fair, large vessels, if well navigated, could pass on the other side, as it was admitted that the United States ship of war, Pennsylvania, the largest which ever floated in the

waters of the United States, had done in 1836, under those circumstances: but that vessels which could beat through the other, could not do so at all through this. The Jersey channel, it appeared was broad and very deep for a few rods just opposite the island, but at its head, in consequence of the Bulk-Head shoal, grew narrow, and therefore less safe. The Delaware channel was soft; the Jersey one hard. The statement received by consent, of Mr. Wilson M. C. Fairfax, of the United States coast survey, which had been recently made, was thus: "The main and deepest channel of the Delaware river opposite the Pea Patch is on the Jersey side. The greatest depth of water in the channel on the Jersey side is 40 feet, and on the Delaware side 25 feet. The average depth of water in the channel of the Jersey side is 32 feet, and on the Delaware side 23 feet. But to take the entire channel on either side of the island, no vessel drawing more than 19 feet water at low water of spring tides can pass through. The Jersey channel is the shortest and widest, and both about equally curved."

Touching the position of the island in regard to the two shores, it appeared that the Jersey shore had been constantly washed away within the last half century, and so receding from the island; that drawing a line midway between the shores, $21^9/_{10}$ acres of the island were on the Delaware side, $65^7/_{10}$ on the New Jersey side; that the north extremity of the island would be 2090 yards from the Delaware shore, and 2130 yards from the New Jersey shore; the south extremity 2197 yards from the Delaware shore, and 1875 yards from the Jersey shore. And that the area of the island is $87^{60}/_{100}$ acres.

With respect to the possession of the island, it appeared that in the spring of 1813, Dr. Gale having acquired the right of the Halls under the survey of 1784, went down there from Trenton, with fifteen or sixteen persons as fishermen, and built a fisherman's hut on piles. It was built of rough boards, was about 12 by 15 feet, had a stove in it, and the fishermen cooked and slept there. Dr. Gale fished here one season, leaving it in August, 1813. The place was not a good fishery, owing to the strength and course of the currents, which swept the nets into deep water where the fish escaped. While he was there, Gen. Bloomfield of New Jersey, who was entrusted by the United States with selecting a site for a fortress, came there, saw him fishing there, and apparently claiming the island; rowed round the island with him and asked him what he would take for it. In December, 1814, the United States sent a corps of engineers there under Capt. Clark of that service, to begin the fortress. No building of any sort, nor the vestige of one, was then on the island, which was occupied by hundreds of thousands of crows, who made it a roosting place. Captain Clark remained there till 1816, from which time till the present, with the exception of a certain term in 1836-7-8, when Mr. Humphrey was in possession under a judgment hereafter mentioned, the possession was in the United States.

The following miscellaneous facts were also put in evidence.

By Delaware:

I. That on the 7th December, 1682, Penn, styling himself proprietary and governour of Pennsylvania and the lower counties, passed, with the advice and consent of the freemen of the province and counties aforesaid, "An act of union for annexing and uniting of the counties of New Castle, Jones and Whorekills, alias Newdale, to the province of Pennsylvania, and of naturalization of all foreigners in the said province and counties annexed." 1 Booth's Laws Del. 8, Append. where this act follows the two deeds of feoffment. The preamble of this act recites the patent for Pennsylvania, and the release from the Duke of York: It then sets forth the two deeds from the Duke of York for the three lower counties, giving in full, and accurately, the description in each, and in the first, the words, "as also the said river of Delaware, and soil thereof and islands therein;" and states that the freemen of those counties have desired to be annexed to Pennsylvania. The enacting part provides for the union, and for the naturalization of such of the inhabitants as were foreigners. Then other acts of legislation in the same year, constituting the body of laws known by the name of "the great law."

This act Judge Baldwin, in his opinion, hereafter mentioned, supposes to have remained in force until the American Revolution.

II. That in the year 1702, the proprietaries of East and West Jersey surrendered all the royalties and powers of government which they had derived under the charters of Charles II. to Queen Anne, who accepted the surrender: and that from 1702 till 1776 New Jersey was governed, not by the proprietaries, but by governors appointed by the crown, who with the provincial legislature constituted the royal government of the colony. Leaming & S. Laws N. J. 606, 607, 614, 628, 629.

III. That in 1796, an order was given in Delaware for a warrant for "two hundred acres of marsh, to be laid on an island situated about five miles below New Castle in the river Delaware, called and known by the name of the Pea Patch." There was no evidence, however, that the warrant had issued or been laid or that any survey had ever been made. It appeared that the warrantee had abandoned the matter because he supposed that the necessary cost of reclaiming and embankment would be more than the island, when reclaimed and embanked, would be worth.

By New Jersey:

I. That King Charles I. had granted to Lord Baltimore many years before the grant to the Duke of York, all the territory between the Chesapeake and Delaware Bays. Kilty's Laws Md. 4to, Annapolis, 1799.

II. That a carefully engraved map in the breviate (or paper book as it was called by counsel,) already mentioned, being an exhibit of the Penns in their suit with Lord Baltimore, the circle was drawn but to the Delaware shore, on both the north and south parts of the circle; stopping at the river and not running into it; and that among hundreds and nearly thousands of maps of the United States and Delaware, published in all parts of the country and in the state of Delaware itself, this circle had never been brought further.

III. That on February 7, 1794, the state of Delaware passed a supplement to an act for opening and establishing a land office, and for the sale of all vacant and unlocated lands (2 Booth's Laws Del. 1174), which recites "that whereas, the right to the soil and lands within the known and established limits of this state, was heretofore claimed by the crown of Great Britain: And whereas by the definitive treaty between his Britannick majesty and the United States of America, his said majesty relinquished all rights, proprietary and territorial, within the limits of the said United States, to the citizens of the same, for their sole use and benefit, by virtue whereof the soil and lands within the limits of this state became the right and property of the citizens thereof, and who at the time of passing the act to which this is a supplement, had, and now have, full power and authority, by their representatives, to dispose of the same for their sole benefit, emolument and advantage: And whereas the claims of the late and former pretended proprietaries of this state, to the soil and lands contained within the same, are not founded either in law or equity; and it is just, right, and necessary,

that the citizens thereof should be secured in the enjoyment of their estates, rights and properties." It then confirms all patents, warrants and grants, by James, heretofore Duke of York, or the pretended proprietaries of the state, made at any time before January 1st, 1760; discharging them from all manner of rents, fines and services, and then goes on to authorize the issue of patents by the state.

But the case as it came before Mr. Sergeant did not come upon the foregoing paper title, and the facts already stated which might be supposed to vary or control it. It was embarrassed by two judgments upon the title; one in 1836, in the New Jersey circuit (Gale v. Behlin [Case No. 5,189]), in favour of the New Jersey title; the other in 1838, in the Delaware circuit (U. S. v. Cockrin [Id. 14,-822]), in favour of the state of Delaware. The former judgment was preceded by a trial by jury, of three days, and by a long and very laboured charge in favour of the New Jersey title from the presiding judge, the late Henry Baldwin of the supreme court of the United States; a gentleman who had enjoyed considerable reputation while at the bar of Western Pennsylvania, was admitted to possess, at all times, uncommon activity of mental action, and to bestow occasional research upon his cases that nearly passed credibility. The judgment in the other case was for default of appearance. On the present trial, however, the case was presented in a different aspect from what it then appeared in. No evidence was given before Judge Baldwin of the deed from King Charles II. to the Duke of York, the non-existence of which was asserted by the New Jersey counsel, and taken for granted by all present.[9] The coast survey not having yet been made, the existence of any considerable channel east of the Pea Patch was unknown; the western being considered the main channel. The island was assumed to be, and at that time probably was, in all its parts, nearer to New Jersey than to Delaware, and no evidence was given like that on pp. 1132, 1133, of any exercise or belief of jurisdiction over the circle by the courts of the latter state.

The judge, in his charge, admitted fully that prior to the American Revolution the western limits of New Jersey came only to low water in the Delaware. His argument then was, that the Duke of York had no title, inasmuch as his conquest enured to the benefit of the crown alone: that accordingly Penn and his privies in estate, could have no title under those grants. He admitted that Penn and his privies did have a right in virtue of long possession, improvement and colonization, but held that the limits of their estates were designated, not by the metes and bounds set forth in the Duke of York's deeds, but only by actual claim and possession or government; and said that upon the evidence before him it was clear that Delaware had never set up rights in the Delaware,

while it rather appeared that New Jersey had. Considering that the natural language of the deed for the circle, gave Mr. Penn a right to a complete circle of twelve miles round, the learned judge said he was unable to give effect to it, inasmuch as such a construction would have given to Penn a large portion of Salem county, New Jersey; a district which the duke had granted many years before to Berkeley and Carteret. He therefore thought it might be construed so as to make its boundaries agree with those which he supposed were settled by possession, which boundaries came, as he supposed, to the water and not into it, or at any rate not further than the middle of the main channel. And to support this construction, he relied on the fact that the deed for the country south of the circle—a deed for contiguous territory, between the same parties and made on the same day—did not profess to convey the river or subaqueous soil: facts which he considered authority enough for him, to explain the latter deed by the former, and to hold that this former deed could not have meant to do so either. He suggests that by the largest construction the deed for the circle could be held "to include only such islands and such parts of the river as lie between a direct line drawn from the north and south points where the circle strikes the Delaware."

But admitting that the deeds of the Duke of York might have described the true boundaries of Delaware, Judge Baldwin ruled that at the Revolution, the state of Delaware "repudiating the grants of the duke as usurpation on the acknowledged prerogative of the king," might "elect to hold the lands of the proprietaries, in the original right of the crown." And he thought that the state had made this repudiation and election by the act of February 7th, 1794, reciting that "the claims of the late and former proprietaries of this state to the soil and lands contained within the same, are not founded either in law or in equity;" that her title thenceforth became founded on the Treaty of Peace; that in this condition of facts, the two states, by the Declaration of Independence, stood on an equal footing, and were equally invested with the rights of the king to all that part of Delaware river and its islands which the king had not previously granted: and therefore that this island, being to the eastward of the "main channel," and nearest to New Jersey, belonged to that state and not to Delaware. Independently of these grounds, he relies on the doctrine of adverse possession, and says that as the Halls held the island under a survey made in 1784, and so had possession without adverse possession or claim under the state of Delaware, until 1815, a term of thirty-one years, the right of entry by that state was barred: and connected with what his honour called "the general claim of the proprietaries of New Jersey to the islands in the Delaware from 1739," would make the title good by a prescription of seventy-four years of quiet enjoyment adverse to the right of the Penns: and this idea it was supposed might derive strength from a recital in the act of the New Jersey assembly of November 24th, 1831, which says it has been represented to the assembly, that by virtue of the warrant and survey of 1784, the Halls had "become seized and possessed of the island," and assumes that by mesne conveyance, Dr. Gale had "become seized and possessed."

Under the judgment in New Jersey, the marshal of that circuit delivered possession to Mr. Humphrey, to whom all the persons on the island made themselves tenants at will.

And on the judgment in the Delaware circuit, the marshal of that circuit delivered possession to the United States.

Each party offered that judgment which was in its favour, as conclusive on the title: but as the jurisdiction of the courts which gave them, depended entirely upon the fact whether the island was within their territorial circuit, that

---

[9] The history of this deed is quite singular. It is not printed in any of the ancient books of Delaware Laws, though the Duke of York's are in all of them. It does not seem to have been put on record in either New York, Pennsylvania or Delaware. It appears, moreover, that when the Earl of Sutherland applied, about the year 1716, for "a charter of certain lands lying upon Delaware Bay in the three lower counties, which he represents he is ready to prove do belong to the crown," and where the persons concerned for Mr. Penn, and several mortgagees and purchasers under him, and their agents were heard before the attorney and solicitor general, Northey and Thompson, that after much search of publick offices the existence of this deed was not discovered: and that too in a case where there is so obvious an impression on the minds of the attorney and solicitor general, that there must be some other title, that they say, "they presume the said Duke of York might have some other grants thereof, which Mr. Penn might give an account of, but cannot, being under a lunacy;" and which made them therefore submit, whether it would not be reasonable that the king's title should be established in chancery before any grant should be made of the premises. 1 Chalm. Op. 39-57.

is, whether it was within Delaware or New Jersey, and as this point was the very one here to be decided and could not be decided without hearing the whole case, the parties consented, on the recommendation of the arbitrator, to give both judgments in evidence, without prejudice, and to wave a decision of the case upon a point of mere evidence, and in a preliminary stage.

Mr. Clayton and Mr. Bayard for the United States.

Before the argument in this case, the counsel of the United States said that they begged to join with their learned friends on the other side, in acknowledging the kindness which had been extended to all the counsel who had been concerned in this trial, by the civil authorities of the city, and especially for the honour of being allowed to conduct the argument of the case in the Hall of American Independence. It seemed to be an appropriate place for the discussion of the means of defending this noble city, which was, in truth, the birth place of American freedom. They tendered the hearty thanks of themselves, their opponents and all concerned, to the city authorities for the accommodations which had been freely furnished for the hearing of the case. Those thanks were also due to the Historical and Philosophical Societies, to the Athenæum, and to the Law Association of this city, all of which had munificently furnished their books, documents, and charts, many of them being no where else to be found. On both sides, we have the benefit of libraries, yielding more information on the peculiar subject we have to discuss, than could be found in any other city of the Union. Our thanks are also due to many gentlemen of the profession in this city, and to antiquarians for the information furnished by them. With the aids thus afforded us on both sides, we are all satisfied that we have had a fair and full trial, and that the testimony in the case is so full as to develope the entire merits of the controversy.

The question is, whether Delaware has the exclusive right to all the Delaware river with the islands in it, and all the subaqueous soil contained within that circle whose centre is New Castle and which has a radius of twelve miles extending from that place as a centre. Delaware claims no right in the river above the circle, and none greater than New Jersey below it. We say 1. Mr. Humphrey has no title. 2. The United States has a good title.

On that first branch of the matter, we contend:

1. Mr. Humphrey's grant is bad in form: He claims under a proprietary warrant authorizing the survey of land; a warrant which does not authorize a location upon the bed of a great navigable river, as this place was in 1784, and in part is still. Then the surveyor, who returns this survey, certifies that he surveyed an island in the Delaware containing 178 acres. We know, from the actual measurement by the coast survey, that the island contains but $87^{60}/_{100}$ acres at this day, and the testimony has proved that about the year 1783 the island first appeared above low water, not larger than "a man's hat." It is apparent therefore, that there was no actual survey made by virtue of these fragments of warrants, and that the statement of the surveyor was made because the fragments of the warrants, when added together, made that number of acres, within an insignificant fraction. It was a fictitious survey, and no title founded on such a foundation can be good. But waving this class of objections, and admitting that Mr. Humphrey has a proprietary grant good in form, we say,

2. That New Jersey never had any title. The territory known as New Jersey was limited by its original charter to low water mark. The language of that grant and of all subsequent grants indicates an exclusion of the river. They all grant land bounded by the river, with many easements in the river; but the river itself or its soil is conveyed by none of them. The original charter grants the Hudson river. The maxim of "expressio unius" applies strongly. This natural construction of the charter is sustained by authority. In 1721, the lords commissioners of trade and plantations sent to Sir Robert Raymond and Sir Phillip Yorke, then attorney and solicitor general, the clauses of the Pennsylvania and New Jersey charters which fixed the boundaries of those provinces, and desired their opinion "whether Delaware river or any part thereof, or the islands therein lying, are by said clauses conveyed to either of the said provinces, or whether the right thereunto doth still remain in the crown?" "We have perused the said clauses," says the opinion of these great lawyers, "and have been attended by the agents of the parties who claim the province of Pennsylvania, and their counsel, who laid before us a copy of the letters patent granting the provinces, and have heard what hath been alleged on both sides. And upon consideration of the whole matter, are of opinion that no part of the Delaware river or the islands lying therein, are comprised within the granting words of the said patent, or of the said annexed extract of the grant of New Jersey but we conceive that the right to the same still remains in the crown." 1 Chalm. Op. 59.

In 1820, Virginia having granted to the United States many years before, her "right to territory northwest of the river Ohio," it was conceded by the supreme court of the United States that her title still extended all across the river. Chief Justice Marshall says: "When a river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one state (Virginia) is the original proprietor, and grants the territory on one side only, it retains the river within its own dominion; and the newly created state extends to the river only, and the low water mark is its boundary." Handly's Lessee v. Anthony, 5 Wheat. [18 U. S.] 375–379.

This case and the opinions of Raymond and Yorke were cited, and the principle just mentioned was recognized as true, by Judge Washington in 1823 (Corfield v. Coryell [Case No. 3,230]) in its application to the boundary of New Jersey, now before us. "We think," says this judge, "the claim of New Jersey under these grants, to any part of the bay or river Delaware, below low water mark cannot be maintained. * * * Neither do we conceive that the limits of the state can by construction be enlarged in virtue of the grant of all rivers, fishings and other royalties; which expressions ought, we think, to be confined to rivers, fishings and royalties within the boundaries of the granted premises." It is true he thought that the enactments now cited in behalf of Mr. Humphrey, "prove beyond a doubt that the proprietaries of West New Jersey, from a very early period, asserted a right to the river Delaware or to some part thereof below low water mark and along its whole length," yet "how far this title in New Jersey may be affected by the grants of the Duke of York to William Penn in 1682, of the tract of country which now forms the state of Delaware," was a question, he says, which in the case before him, "it would be improper to decide." Though neither of these two cases was a decision on the point, they both concede what we here labour to establish. That the state was limited by its charter to low water mark was admitted in 1830, by counsel on both sides, in Bennett v. Boggs [Case No. 1,319], and asserted by Judge Baldwin, who truly says, that though the proprietaries of New Jersey might claim to own and dispose of the fisheries in the Delaware, "their claiming beyond the limits of the charter could give them no title."

3. But admitting that the charter of New

Jersey extended over the whole river, Mr. Humphrey has not got the New Jersey title. None passed by either the proprietary grant of 1784, or the legislative act of 1831.

As to the proprietary title: In 1702 the proprietaries of New Jersey surrendered all their royalties and powers of government, and from that time ceased to govern the territory of New Jersey; reserving to themselves only what Lord Hale and other writers denominate the jus privatum—nothing more than the private right to the soil, which they held then and hold still. From 1702 to 1776, the beds of all the navigable rivers within her charter, being part of the regalia, were out of their reach and beyond their control. The royal government alone could grant them away. The Declaration of Independence transferred all the regalia and powers of government to the state of New Jersey, in her sovereign capacity: the proprietaries after the surrender, held neither the jus regium nor the jus publicum. Any grant by them of subaqueous soil was void. Waddell v. Martin, 16 Pet. [41 U. S.] 367, being a case upon this identical charter, has decided the question. The supreme court of the United States there held a proprietary grant for subaqueous soil in the waters of the Raritan Bay and river to be void, and sustained the holding of the defendant in that case, who claimed the submerged soil under a grant from the state legislature. The ground of the decision was, that the regalia were in the state, and not in the proprietaries.

As to the state title: The legislature said truly that "doubts" had arisen as to the proprietary title. But has it cured them?' In 1815, this island was reclaimed by the United States. It rose above the flow of the tides. It was no longer part of the regalia. It became vacant land, for which none but the proprietaries could make title. Mr. Humphrey then, by the largest concession of facts, is in this predicament, that when the proprietaries conveyed, in 1784, the title was in the state, and when the state conveyed in 1831, the title was in the proprietaries. We say now, arriving at our second great position:

II. The United States has a good title:

The existence of a grant by the crown cannot be doubted here. We have given all sorts of evidence of it. It can as little be doubted that it was made for Mr. Penn's benefit and not for the duke's. The breviate shows that it was in the possession of Penn's sons in their suit with Lord Baltimore, brought in 1735, and heard in 1750; and other testimony here, that it was found at the seat of the Penns in 1837–8. With such evidence we incept our title. We need not re-state it. Such a title proved by original deeds, found, far onward in two centuries, in their proper places, perfected by livery of seizin most formally delivered, and confirmed by the royal and ducal government in New York is impregnable. Its exhibition is conclusive.

A question will probably be raised on these deeds as to the right of the king of England, since Magna Charta, to grant a river and the subaqueous soil to a subject so as to pass the islands subsequently arising in the river: but it is a question which is settled by authority. Maritima incrementa, says Hale (De Jure Maris, 14, 17, 18), belong, of common right, to the king, but may become the property of a subject by grant or prescription; and among these maritima incrementa, he speaks of those which come per insulæ productionem, the sort we are now considering. It is true that in such grants the jus privatum of the grantee is always subject to the jus publicum. The right of navigation and passage and repassage, unobstructed by nuisances and unimpeded by exactions, has always been admitted as a jus publicum, belonging to the people, and from which no grant by the crown could derogate. It is called a servitude belonging to the people. Id. 6.

Whether the common right of fishing in navigable streams is in the people at large, as part of the jus publicum, so as to prevent a grant by the crown excluding it, since Magna Charta, is a question yet open for discussion, but it has no bearing on this case. That the crown might grant a navigable river and the soil thereof, subject to the jus publicum, has never been doubted, and the propriety of islands arising in the river, cannot be a part of the jus publicum, because that refers solely to common rights, and islands must, from their nature, be the subject of exclusive appropriation. The common right of navigation is now in all the people of the United States, and no state can control it; but the common right of fishery is in the people of each state, and to the extent of her jurisdiction, and within her territorial limits, the state may control or grant it. In this case, however, it is unnecessary to determine whether the right of fishing in the river Delaware, within the twelve miles circle, is exclusively within the jurisdiction of Delaware. Admitting, however, a common right of fishery in the people of the colony of New Jersey in 1682–3 and subsequently, this would not grant the river or its soil, whether the right arose from grant or prescription. A prescription, extending to a liberty, profit à prendre, or jurisdiction, such as liberty of free fishery, &c. is not an acquest of the soil or water, but leaves them where it found them. Id. 32.

The argument which will also be made, that the duke had no title to the property conveyed, until after the royal conveyance was made, and that therefore Penn's title was void, is not quite as "old as creation," but it was made more than a hundred years ago by Lord Baltimore in his suit with the Penns, was then answered by Lord Hardwicke himself, and, till now, answered beyond all power of renewal. The earl says: "I will lay aside the question of estoppel, which is a nice consideration; for the Duke of York, being then in the nature of a common person, was in a condition to be estopped by a proper instrument. In 1683, the Duke of York takes a new grant from the crown, and having granted before, was bound to make further assurance; for the improvements made by Penn were a foundation to support a bill in equity for further assurance. The Duke of York, therefore, while a subject, was to be considered a trustee; why not afterward as a royal trustee? I will not decree that in this court; nor is it necessary, but it is a notion established in courts of revenue, by modern decisions, that the king may be a royal trustee. And if the person from whom the king takes by descent was a trustee, there may be grounds in equity to support that. And if King James II. after coming to the crown was a royal trustee, his successors take the legal estate under the same equity; and it is sufficient for the plaintiffs if they have an equitable estate." Nothing can be more sensible; nothing better founded both in the justice of the law and in the justice of morals. The duke, no doubt, was "estopped," and the estoppel, working on the interest in the land, ran with the land. Hermitage v. Tomkins, 1 Ld. Raym. 729, is in point as to the duke's being estopped. Lord Holt there ruled, "that if A, not having any thing in certain land, demises it by indenture to B, and afterwards A purchases the land, this will be a good lease by estoppel." And the second resolution in Palmer v. Ekins, 2 Ld. Raym. 1550, 1551, is equally in point as to the operation of this estoppel upon any second grantee of the duke, if there ever had been such a grantee, which there certainly never was. That resolution, which makes no exception in favour of the crown, is thus: "Privies in estate, as the feoffee, lessee, &c. shall be bound by, and take advantage of, estoppels. If A lease by indenture to B lands in which he hath nothing, and afterwards A purchases the lands in fee, and sells them to D and his heirs, D shall

be estopped. And where the estoppel works on the interest in the land, it runs with the land into whosesoever hands the land cometh."

This doctrine is assumed as true in Trevivan v. Lawrance, 1 Salk. 276, of which case the marginal abstract (made probably by Knightly D'Anvers or Sergeant Wilson) is this: "Where estoppel works on the interest of the land it runs with it, and is a title." It may be admitted that in general the crown is not bound by estoppels; that is to say, no estoppel can arise from any grant or act of the king so as to bind the crown. But if the king acquires by descent, or otherwise, lands which are bound by estoppel as against the person under whom he claims, the estoppel will continue even against the crown.

The language in Reg. v. Delme, 10 Mod. 200, which will be cited on the other side, is the language, not of the court, for the case concludes with an "adjournatur," but of counsel in argument. The authorities referred to in support of it are 1st Siderfin, (a doubtful authority for any doubtful position) p. 412, and that is a short note deciding that the king may bring an action where he pleases; and Hobart, p. 339, where the ruling is "warranty collateral binds not the king without true and actual assets, nor by estoppels of his own recitals ex certa scientia." This is in accordance with the distinction contended for, and it is believed that no case can be found contrary to that distinction. Even if the duke was not thus technically "estopped," so to pass a title at law,—of which, when coming by estoppel, it is said in one of the preceding cases "an ejectment is maintainable upon the mere estoppel"—he surely was estopped in equity. His covenants for further assurance made him a trustee, whether a common or a kingly person; and what more is wanted here?

But however imperfect Mr. Penn's title may have been in its origin, it was made perfect in various ways by confirmation from the crown. The letter from Queen Mary in 1694, is confirmation. It was a restoration in all things; in rights of soil and in powers of government. Then, how could the sons of Penn have sustained their bill in equity before Lord Hardwicke, 1 Ves. Sr. 444, without a title and a good title. The bill in the curious breviate here produced, shews that they set out their title very fully. The act of September 2d. 1775, shews, moreover, that after being settled by Lord Hardwicke, Penn's title, as thus set out in the bill, was confirmed by Geo. III. in 1769, and by the state of Delaware on the very eve of her declaration of independence. The legislature which passed the act of September 2d, 1775, appointed the delegates who attended in this hall, and declared her independence ten months thereafter. She thus came into the Union, claiming the Penn boundaries; and the principle established by the supreme court of the United States is, that each state, on the Declaration of Independence, became invested with all the sovereign power within her colonial limits.

It has had indirect confirmation of a very strong kind. At the commencement of the eighteenth century the country was greatly excited by contests about the royal powers of government, in all the colonies, but especially those of New England. New Jersey surrendered them in 1702, and continued under a crown government from that day until the Revolution. The ministry of England procured the passage of the statute of Anne which prohibited the crown from granting charters with royal powers within the kingdom; and after that day no charter with such royal powers appears to have been granted among the colonies. But Penn's continued to be a proprietary and charter government, with royal and sovereign powers, subordinate to the crown, and in many respects resembling the government of a county palatine in England. He was never displaced but once, and then only to be restored. It derived further confirmation in 1717 when a powerful nobleman at the English court, the Earl of Sutherland, petitioned the king, without success, for a grant of Penn's three lower counties. The privy council referred the matter to Northey and Thompson, the attorney and solicitor general. The deed from the king was not before these officers: its existence was unknown to them. Penn, they say, was unable to appear, "being under a lunacy." The case was less strong than that here presented, yet the attorney and solicitor general conclude their report as follows: "On the whole matter, we humbly submit it to your majesty's consideration, whether it will not be reasonable that your majesty's title should be established by the court of chancery before any grant should be made of the premises." 1 Chalm. Op. 39–56. Was any such effort at establishing the title in chancery ever made by the Earl of Sutherland, by the king or by any one? It was not. Penn's title derived further confirmation from the decree of Lord Hardwicke (Belt, Supp. Ves. Sr. 198), which saved the rights of the crown, and gave liberty to either party to move to alter the decree in case the crown should ever disturb the possession. But no such motion was ever made that we have heard of, and we must infer that the crown never did disturb the title. Indeed, there is an opinion of Northey, attorney general, expressly in favour of Penn's title to the three lower counties. The opinion was given in consequence of a contemplated agreement between the crown and William Penn, to purchase from Penn his right of government of the province of Pennsylvania and the three lower counties. Its date is 1711, and it is stated that William Penn waited upon him with his title papers, both of the province and three lower counties, and had made out his title thereto. 1 Chalm. Op. 32.

But it is said, or will be said, that in 1685, in the controversy with Lord Baltimore, the title was decided to be in the crown. Let us look at the history of that case. At that time Lord Baltimore contested Penn's title before the privy council. He claimed that his own patent from Charles I. for wild and uncultivated land, extended to the Delaware river. The privy council decided against his title, on the ground that the territory in dispute was not a savage country, (the only sort of country granted to Lord Baltimore to settle and civilize,) but was settled by a Christian people, to wit, the Swedes and the Dutch, who had been located on the Delaware before Lord Baltimore received his patent at all. Penn's title was not before the privy council. It was not necessary for him to show it. It was sufficient for his purposes to show that the crown had never granted it to Lord Baltimore, who, having petitioned the king on that occasion for a hearing on his title, stood before the privy council like a plaintiff in ejectment, bound to show a title; and he failed to do it. Penn, being heard before the council, in behalf of the crown, like a defendant in ejectment, folded his arms, and relied on the insufficiency of his opponent's title. The decree was in favour of the king, and properly so, because, as against Lord Baltimore his claim was good. But the king's claim, which was thus adjudged good against Lord Baltimore, was, as against Penn, good to this extent only, that he was "royal trustee" for Penn, who held all the beneficial proprietary interest.

We maintain the Penn title, because it is the true title; and we are instructed by the concurring testimony of the best professional men in Delaware, that with one or two exceptions, the inception of title to land there is by a proprietary warrant and survey, whenever it is necessary to trace a Delaware title back to its origin. But whether Penn had the title or not from the Duke of York, the duke had the title from the king. So the title was out of the crown; and the boundaries in the king's patent, which

are nearly identical with those in the deeds from the duke to Penn, are the proper boundaries of Delaware, even on the supposition that Penn had not the title. For, suppose the deeds from the duke to Penn to be void, still the fact appears that the Penns held possession of the country, and governed it, for nearly one hundred years. They either held under their own title, or under that of the Duke of York, or by his acquiescence; and they held by the metes and bounds in the king's deed, which have always been the metes and bounds of the colony and the state. In this aspect of the case the title is just as clear as if the Penn title were indisputable. With regard to the jurisdiction exercised since the memory of men now living, we need not enlarge. The venerable Kensey Johns, whose high character for learning and integrity, and whose great opportunities for judging, must be well known to the arbitrator—he, and all the other professional gentlemen who have been examined, swear positively that, so far as they have ever heard or known, the state of Delaware has exercised exclusive jurisdiction within the circle, and that they have never heard her right to do so questioned in Delaware, except in the single instance of these Jersey claimants under this Jersey title. Many of the witnesses give in evidence acts of jurisdiction by Delaware up to low water mark on the Jersey shore, her officers seizing vessels and persons, debtors, and offenders against the law, in all parts of the river within twelve miles of New Castle, without question of the Delaware right. On the other hand, the only evidence of the exercise of judicial jurisdiction by New Jersey, within the circle was, that a constable came to the Pea Patch to arrest a man who had assaulted another between the island and the Jersey shore. He showed no process but a pistol. The fisherman denied the jurisdiction of New Jersey and refused to go with the constable, who had to return without him; but the fisherman told him that if he would go to Delaware and get regular process from one of her courts, he would go with him! The fisherman understood the common law of the country; and the people there understood no different rule.

Without particularizing them, we need only say of the various legislative enactments of New Jersey, that none of them are of sufficient force to control the clear language of the charter, nor indeed to do more than countervail other enactments of the same state. The act of January 21st, 1709, which brings the western limits of the counties but to the river, is strongly against them all, even if the state had a right to give herself, of her own mere motion, rivers and territories which belonged to others.

As to the adverse possession, the evidence has been already stated. Was this such a pedis possessio as will constitute an adverse holding against the state of Delaware? Even if adverse possession made a title against that state; which the learned counsel on the other side, who come from states where the law may be different, will allow us to inform them that it does not. The state had no knowledge of it. It was an insignificant thing at best, which, if noticed, would not have been resisted. It proved to have been an unprofitable speculation, and because they knew that it would prove so, is the reason why the fishermen from New Castle never attempted any similar enterprise. You might as well go about to prove title to a whole forest, by showing that you had hunted the bear and the panther, or any other animals feræ naturæ, there, as to set up a title to an island under water at high tide, by proof that you had, at some time, fished for shad and herring on its margin. We say nothing of the absurdity of attempting to prescribe for a shoal beneath the flow of the tide. The proof of the case renders it unnecessary to discuss the law of prescription, or its application to such an object. It is said that Stypson's Island and Egg Island were held under grants from New Jersey. The islands were in the bay near the Jersey shore, and outside of the circle. We know nothing of either, or of the grants for them. In Smith's History of New Jersey (page 415), it is mentioned that as late as 1758, the Indians claimed title to "Stypson's Island, near Delaware river." If this be true, we may doubt perhaps the existence of any state grant for it prior to the Revolution. But we enter our protest against any attempts to establish a prescriptive right to either lands or waters within the limits of Delaware, by showing a trespass on what the law writers call "an unguarded possession," a trespass of which the state had no notice, or which was too insignificant to attract attention or resistance. If it could be proved that any citizen of New Jersey had built a temporary shantee on the little sand flat called Goose Island, or even pastured a cow there, would it not be ridiculous to set up an adverse holding within the circle for the state of New Jersey, when the people on the opposite shore had either not noticed the fact, or, through charity for the poor man, had not driven him away?

The object of Penn, in obtaining the grant of the river and soil of the Delaware may be readily conceived. It was to command the door and entrance to his favourite colony of Pennsylvania, including the intended city of Philadelphia. He wished to protect that colony from the exactions on its commerce to which it would be liable, in case the country on the right bank of the river, below Pennsylvania, and the river itself, should fall into unfriendly hands. The historian Ebeling, of Hamburg, tells us that the object was the safety and security of Pennsylvania (1 Haz. Pa. Reg. 34); not only the security of the navigation and commerce of the river, as necessary to the prosperity of his colony, but also the safety and defence of that colony against an invading foe. The power of establishing marshal law for the suppression of insurrection, mutiny, and rebellion, and the power of repulsing and expelling all invaders, were expressly conferred upon him by the duke's deed, as explained by the subsequent deed from the king. Without the river, he could not erect a fort on an island within it, nor plant a chevaux-de-frise, to repel a hostile fleet; for, in his prior grant of the colony of Pennsylvania, of 1680, his whole colony was bounded on the east by the low water mark on the western side of the Delaware river. Observe the language of the deeds, connected with the circle. So far as they convey the land, it is only that lying within the circle; but when they convey the river it is different. They convey all the islands in the river, "and the said river (i. e. the whole river) and soil thereof lying north of the southernmost part of the said circle." Penn had already the province of Pennsylvania, stretching its broad side for nearly two hundred miles along the river. He next gets twenty-four miles of a small sterile country below, and all the river. Can it be doubted that he meant the grant principally for the benefit of the larger tract as well as of the small one? With the policy of the compact of April 26th, 1783, by which Pennsylvania surrendered one-half the river above the circle to New Jersey, we have nothing to do. But we think it clear, from the evidence before us, that there was some mistake about the Pennsylvania title, and that Penn was as great a statesman as some who have succeeded him. The opinion of York and Raymond, in 1721, that neither Pennsylvania nor New Jersey had title to the river and its soil, by virtue of their respective charters, was true, but this opinion would have been changed by the production of the deeds under which Penn acquired his title to the three lower counties, and all the river and soil thereof north of the southernmost part of the circle. Those deeds could not have been known, we think, to the commissioners who negoci-

ated the compact of April 26th, 1783. There is ground to believe that islands in the Delaware were granted by Pennsylvania prior to the Revolution. See Fisher v. Carter [Case No. 4,815].

As to the value of Judge Baldwin's opinion. The case was tried on the most imperfect information, and the charge is inconsistent and confused. But the doctrines of the court, as we read them, were unsound even upon the case as it there appeared. The doctrine of adverse possession we have disposed of. The line suggested as possible, from the two points where the circle touches the river, it will be seen by the chart, would actually give us the island which we claim, as well as a part of New Jersey which we don't claim. That part of the opinion in which he construes one of the duke's deeds by the language of the other, merely because they were both executed between the same parties and on the same day, though for different tracts of territory, is an example of judicial license for which our law books furnish no parallel. Then Judge Baldwin considers the act of February 7th, 1794, a disclaimer of the Penn title. We need not explain the true objects of the act, which are well known to the profession in Delaware. But whatever it may mean, or whatever it may do, it is apparent that one of its great objects was to confirm all the titles in Delaware which had ever been lawfully issued, either by the Penns or the Duke of York. The judge calls the recital in the preamble of this act of Delaware her "repudiation" of the proprietary title. What he means by repudiation our law books do not advise us. Is it that the state is estopped to assert the truth by a mere preamble in one of her legislative enactments? But New Jersey could not take advantage of such an estoppel, if there were any, because she is a stranger to the act. There can be no estoppel which is not mutual. The holding of the judge amounts to this, that Delaware, through her act of 1794, had, by way of estoppel, or, as he calls it, by "election and repudiation," ceded away a part of her territory to New Jersey. If so, New Jersey must have agreed to accept this portion of territory from Delaware, before she could become entitled to it. There must, therefore, have been some compact or agreement between the two states, the one to cede away a part of her territory, and the other to receive it as a part of hers. To this the reply is, that the constitution of the United States declares (article 1, § 9), that "no state shall, without the consent of congress enter into any agreement or compact with another state." The doctrine that Delaware, on coming into the Union, had her "election" either to affirm or repudiate the proprietary title, is a new doctrine, never heard of before. Who had the right to put her upon her election? What principle, or what rule of duty, demanded such a thing of her? If the legislature of Delaware had asserted in a thousand preambles, that the Penns, in 1794, had no title to the vacant lands in Delaware, the whole of them would not have shaken the great fact established by all history, that William Penn was the owner of the vacant lands in the territories comprising the three lower counties.

There yet remains another view of this case; and, if we are right in it, the title of the United States is good, although the utmost pretensions of New Jersey, which are that her title extends to the middle channel of the river, should be sustained. If she holds to the middle of the channel, where is that channel? Mr. Fairfax, of the coast survey, proves that the Jersey channel is the widest, deepest, shortest and most central channel. The inference must be that the volume of water which daily passes on the Jersey side is greater than that which passes on the Delaware side. We have no definition in the books of what the "main channel" of a river is, but we

suppose that such a channel is that one through which the greatest volume of water passes, and which is nearest to the centre of the river. Indeed Mr. Fairfax says in so many words, that the Jersey channel is "the main channel." It is true that pilots, and common watermen who navigate but small craft, consider the western channel to be the "main channel;" by which they have meant, generally, that it has been more navigated by vessels than the other. But they appear to have been ignorant of the depth of water in the eastern channel, and their testimony reminds us of the refusal of some of the New York pilots to believe in the existence of Gedney's channel, long after the coast survey had published its soundings to the world. Our Delaware pilots, although among the best in the world, were unacquainted with the existence of Blake's channel, on the western side of the bay, before the coast survey disclosed its course and depth. In 1836 the Pennsylvania line-of-battle ship, the largest vessel that ever floated on the waters of the Delaware, passed down the Jersey, not the Delaware, channel. It is admitted that the bottom of the Delaware channel is soft, and the channel itself better known, which is the reason why it is preferred; as an injury from grounding on mud bottom would be less than an injury from grounding on a bottom of sand or gravel.

It has been said that in ancient days the depth of water in the eastern channel was much less than it is at present, and that the river has been constantly gaining for a number of years upon the New Jersey bank. That does not alter the relative rights of the two states. In such a case, what is lost by one of two coterminous states is gained by the other; and if it had been proved that the main channel was formerly on the Delaware side, but that it had insensibly changed its course and passed through the Jersey channel while forming the island, the law of nations would, in that case, clearly give all the alluvia and all the islands westward of the new channel to the state lying on that side of it. The distinction is between alluvion and avulsion. A state loses or gains by the former, but not by the latter.

Mr. Bibb and Mr. Eaton, for the United States. The grant of the king to the Duke of York, 12th March, 1663–64, was of an immense region extending from St. Croix in the state of Maine, to the southernmost extremity of the state of New Jersey. Its object, after dispossession of the Dutch, was colonization. It conveys all waters, fishings and royalties appertaining to the granted premises. The duke, in 1664, conveys a very large portion of the tract to Berkeley and Carteret, with the same extensive estates, rights and privileges. Colonization was the sole object of this grant. Upon such grants, made with such objects, it is difficult to presume that a right to a natural portion of the river was withheld. If not essential to the purposes of the grant, it was largely conducive to them, and all presumption must be in its favour. The river was in early days the only mode of passing from the northern part of the colony to the southern; the colonists were constantly upon it passing up and down. It would have been inconvenient, in the highest degree, that crimes committed below low water mark should have been without the limit of any cis-Atlantick jurisdiction; amenable only to courts more than three thousand miles away. The breviate produced on the other side, shews that in their suit with Lord Baltimore, the Penns actually adduced as part of their title to Delaware, this grant of 12th March, 1663–64. "It is pretended," says the breviate (page 37), "that as this grant to the Duke of York, when coming from the eastward, extends only to the east side of Delaware Bay, so that it did not by express words

include the three lower counties which are on the west side of that bay. But it was a very large and extensive grant, of several very large tracts and territories in America, and passed as we say all lands appertaining to those extensive tracts." And by this the Penns claimed Delaware. This was carrying the matter certainly very far, and the intelligent counsel of the Penns properly admit, that so carried, it is a weak point in their case. It would have passed half a continent. But even in this extent, it was the doctrine of the Penn proprietaries of Delaware in 1735; and the state of Delaware cannot complain of that argument if, in 1847, we lay hold of what is but a hem of its garment.

How does the case stand upon authority?

We have no knowledge of the circumstances under which the opinion of the crown lawyers was given in 1721. 1 Chalm. Op. 59. It is probable that it was upon the application of some person for a grant of those islands. There could not well have been any other occasion for it. Crown lawyers understood the proprieties of their office, and, as might have been predicted, the opinion is in favour of the crown. But was any grant ever made in accordance with it? any act done in consequence of it? Certainly none ever was; and considering the zeal with which these grants were asked for, we may well oppose the action of the crown, to the abstract opinion of its counsel. Looking only at "clauses extracted out of the charters of New Jersey and Pennsylvania," the crown lawyers may have been right; looking at the whole charters, their objects, the colonization under them, and the interpretation which had been made upon them, by fifty-seven years of practice and action, they were certainly wrong.

It is certain that in Handly's Lessee v. Anthony, 5 Wheat. [18 U. S.] 374, 385, the doctrine we oppose was but conceded, not decided. The judgment went on another point. But even the concession was upon a very different case. Virginia, a populous state, having a people living on its river, grants to the United States, out of pure liberality, "the territory northwest of the river Ohio." It grants territories, nothing else. It conveys no powers of government, nor appurtenances, nor privileges, nor rights, nor estates whatsoever, connected with, or appertaining to the original territory. The gift is limited "to territory northwest of the river:" the bare territory. Compare the language of the grant by Virginia with that of the grant by Charles II. ante, p. 1124. One carries every thing; the other, land, and land alone. The difference between them is as wide as the poles. They are grants, and that is the only point of resemblance between them. Corfield v. Coryell [Case No. 3,230] is no authority either; for the case was decided upon the form of action alone; and though Judge Washington, referring to the grants of Charles II. and the Duke of York, does say, that *under these grants* (italicizing the words) the claim of New Jersey below low water mark cannot be maintained, he yet says, after looking at but a portion of the early New Jersey legislation produced here, that "these acts prove, beyond a doubt, that the proprietaries of West New Jersey, from a very early priod asserted a right to the river Delaware or to some part thereof, below low water mark and along its whole length." It is unimportant for our case, as we shall shew hereafter, whether the right arose on a nice interpretation of the charter, or whether it arose from claim de facto. We beg to say too, that Judge Washington's limitation of the rivers, fishings and royalties granted, to those "within the boundaries of the granted premises," is a limitation different from that of the charter, which gives not those "within" the premises—but those "belonging and appertaining to them, with their and every of their appurtenances." Who can doubt that the river Delaware is to

some extent naturally "appurtenant" to New Jersey? It washes her shores along her whole western length. It receives the waters of her streams and rivers. The products of her soil are shipped directly upon it. Her people drink its water, and take its fish for their sustenance. They erect their mansions upon its margin, and contemplate, with the pride of ownership, the broad and beautiful expanse which gives to the landscape its crowning grace. It has always been so; so let it ever be! You might as well tell the people of New Jersey that their title papers were blanks, and their estates "air, thin air," as tell them that the mud which the receding tide exposes, is all their right in this noble stream; this stream so nearly connected with their present enjoyment. their future wealth and their ancient glory. Of Bennett v. Boggs [Case No. 1,319] we need not speak. It was decided upon the last two cases, neither of which is authority for its doctrine. Much better authority on this particular subject is that of Chief Justice Tilghman. Kean v. Rice, 12 Serg. & R. 203, 209. In a case before him, a defendant of Pennsylvania being prosecuted by an inhabitant of New Jersey for taking oysters in Delaware Bay below low water mark of the Jersey shore, set up, among other defences, that New Jersey had no jurisdiction. "Very laborious researches into ancient records have been made, to. shew that New Jersey was bounded on the west by the Bay of Delaware, and therefore could have no jurisdiction below the low water mark. Such a doctrine." says the chief justice, "would come with an ill grace from the courts of Pennsylvania, which is bounded on her charter, on the east, by the river Delaware, and yet has always claimed and exercised jurisdiction at least to the middle of the river, and finally settled, by a solemn compact with New Jersey, the right of navigation and jurisdiction as to the whole river. In the construction of the colonial charter, ancient claim and usage, are entitled to very great weight. Not long before the American Revolution, Lord Rochford attempted to obtain a grant from the crown of England of some valuable islands in the Delaware, opposite and near to the Pennsylvania shore, under pretence that the charter to William Penn was bounded on the east, by the river. The argument seemed plausible. But the proprietaries of Pennsylvania, having obtained a hearing before the king in council, and proved that they had always exercised jurisdiction on the river, always claimed those islands, and granted some of them for a valuable consideration, which had been improved at great expense by the purchasers, and were then very valuable, the claim of Lord Rochford was relinquished."

We have to regret that while this case is argued on one side by lawyers of Delaware, who are intimately acquainted with all her local and juridical history, who know instinctively where to apply for evidence of all that she has ever claimed; it should be argued in behalf of New Jersey by those who have scarcely any knowledge of what relates to her peculiar history or claims at all. There are many islands in the Delaware which lie nearest to her shore; some of them have been held under title prior to the Revolution, and no doubt the records of her land office would shew that they are held under warrants from her, as those nearer Pennsylvania are affirmed by Chief Justice Tilghman to be held under warrants from that state. It would appear from Smith, the historian (Hist. N. J. 445), that New Jersey claimed Stypson's Island, which is believed to be in the Delaware; and we are credibly informed that Egg Island is held under a New Jersey warrant. It is not important that these islands are without the circle; for according to the argument of the other side, New Jersey did not come, any where along her whole extent. below low water mark. If she came below that mark without the circle, the same charter or the same usurp-

ation would take her below within it. As for Reedy Island and Bombay Hook, nothing can be inferred from the claim of them by Delaware, though within the circle, for they both lie much nearer to Delaware than to New Jersey. Here, let it be remembered, was New Jersey, a great state, with soil and powers of government granted away; remote from the parent country; its people stretching themselves, as is usual in a new country, along the water's margin. How naturally would they by degrees usurp rights beyond those granted by their deed! Pennsylvania we see did it; and the usurpation was admitted by the crown. New Jersey had been there sixteen years before Pennsylvania, and having no opposite neighbours, was still more likely to do it. Individuals may not be able to prescribe against the crown, but a distinction in favour of colonies—of nations as these truly were—seems entirely natural. "I am of opinion," says Lord Hardwicke in his opinion upon the disputes between the Penns and Baltimore (1 Ves. Sr. 444, 453), "I am of opinion that full and actual possession is sufficient title to maintain a suit for settling boundaries: a strict title is never entered into in cases of this kind, neither ought it. * * * I will say once for all, that long possession and enjoyment, peopling and cultivating countries, is one of the best evidences of title to lands in America that can be; and so I have always thought in all cases since I have served the crown; for the great beneficial advantages arising to the crown from settling, &c. is that the navigation and commerce of this country is thereby improved. The persons, therefore, who make these settlements ought to be protected in the possession as far as law and equity can." Now, with even our imperfect evidence we can shew, that in all probability the state of New Jersey did never consider herself as bound by low water mark. Pennsylvania, bounded just like her, we see did not. Why should New Jersey be presumed to have done so? It was against her convenience. It was no where so directly prescribed to her. Handly's Lessee v. Anthony had never raised doubts upon the question, and the general law of nations was in her favour. We find, accordingly, that six years before the Duke of York's grant to Penn for the circle, New Jersey actually grants "convenient portions of land for wharves, keys and landings." There was no limitation to their extent. A break-water to the middle of the bay and wharves to an indefinite extent in the river, were both within the right. In 1693, she declares Delaware Bay "within the boundaries of her government," and in the strongest way treats its whalery as within her jurisdiction. In 1725, she taxes the ferries across the river, and enacts such laws as shall compel the neighbouring colonies to pay the tax. In 1771, she treats the soil of the river as well as its waters completely as her own property, giving to commissioners "authority to clear, scour, open, enlarge, straighten or deepen" the river; to remove any obstructions in it; and provides for the trial of any offence against the act, committed upon the river. All these acts, with others not very unlike them, are publick acts of her legislature, which it must be presumed were known, and which, so far as the evidence goes, is certain were never opposed nor questioned by any body, least of all by Delaware. We repeat, it is of no moment that they are not specifically applied within the circle. The whole of the western boundary of New Jersey, so far as the charter limits give it, is the same: and in construing the charter as coming below low water mark, there is no limitation to those portions above and below the circle, nor exception of that part within it. Now what on the other hand is the title of Delaware? The deeds to Penn from the Duke of York certainly convey no title of themselves. But it is said that the royal charter of 22d March, 1683, to the Duke

of York made good, "by estoppel" or some other operation of law, a title which, of itself, is conceded to be bad. But to this position there are objections:

I. That charter could convey nothing which had been previously granted to Lord Baltimore, as all the land between the Chesapeake and Delaware Bays had been. It is of no use to say that Penn finally established a title to the Delaware half of that same territory, in Penn v. Lord Baltimore. He did so as the report of the case shews, principally in virtue of the articles of agreement of 1732, coupled with long possession and colonization. The order in council of November 7, 1685, which was made after the charter to the duke, gave this territory to the king, not to Penn; and that order, so far as Lord Baltimore was concerned, deprived him of no right under the charter;—which could not be repealed, it is submitted, by any order of council, nor otherwise than by scire facias to repeal the charter for deception, or as having been improperly granted. What motive Lord Baltimore had for entering into the articles of 1732, by which he surrendered a portion of his territories, we need not inquire. That he thought them unjust is clear, since he strongly resisted their execution. It is enough for our purpose that on them the Penns' bill was filed, and that on them with possession and colonization he got the decree.

II. That if the charter did convey to the Duke of York, the estate which he, having nothing in, had previously granted to Penn, and if the duke had been bound, as a private person, by the estoppel which, in virtue of the two deeds, might make a title to Penn, yet the duke was freed from it so soon as he ascended the throne. "There is no arguing," said counsel in Reg. v. Delme, 10 Mod. 200, as if stating a well settled doctrine, "from proceedings at law between subjects, to suits where the crown is a party, because the crown has several privileges; as the crown may wave their demurrer, take issue and wave that issue. The crown may change their own venue. The queen may amend her pleadings at any time, nor will any estoppel bind the crown."

There is another inquiry to be made. Could the king of England, in his prerogative right, grant the beds of navigable streams where the tides ebb and flow, and which are thus reckoned arms of the sea? Does not Magna Charta prevent him, and does he not hold them in trust for the benefit of all the subjects of his realm, and not to be bestowed in monopoly or for individual benefit? Martin v. Waddell, 16 Pet. [41 U. S.] 411. Delaware then has no paper title; and what is the evidence of any claim, or exercise of exclusive right upon the river beyond the middle line; claim, it is meant, anteriour to the Revolution. That of the fort tax was met by resistance as soon as it was made, and abandoned by Delaware as soon as it was resisted. This case shews that Delaware was ready not only to assert her rights, but to assert much more than her rights. Though Delaware incepts her title in a way which Penn always knew to be irregular, which the Earl of Sutherland asserted before the commissioners for trade and plantations, in 1717, was void, and which the crown lawyers thought was very doubtful; though she was in dispute with the Maryland proprietaries for seventy-eight years, and through two generations of both the Penns and the Baltimores; and had, on these accounts, great motive to recur to her boundaries frequently, and to define them with precision; where is the act by which she has asserted that she owned all the river, its soil and its islands clear to the Jersey shore? The decree in chancery (Penn v. Lord Baltimore, 1 Ves. Sr. 444), in 1754, had reference to the western boundary. It went upon articles of agreement between the parties. No one pretends that Lord Baltimore ever owned or even ever claimed either the river, river-soil or islands, within the twelve

miles circle. His claim was to the river not over or in it; and the Penns contended that he did not even come to the river by many miles. Is it not then absurd to say that by a suit against Lord Baltimore for a specifick performance, Penn could acquire the property now in question. Besides, neither William Penn nor Lord Baltimore, in their agreement of 1732, had any power to contract for New Jersey; nor to compromit the rights of the colony of New Jersey by a bill and answer, and decree of the court of chancery in England, for specifick execution of a contract to which New Jersey was not a party contracting, nor a party in the suit. Lord Hardwicke, in his opinion and decree, states the case as a matter between the parties to the suit, and as not binding the tenure of the planters, nor the rights of. the crown, nor the rights of any person not a party to the suit. While on the subject of Lord Hardwicke's decree, it is to be observed that so far from resting the Penns' Case on their deeds, the earl, puts it upon possession and settlement as perhaps its strongest grounds.

But admit that the deeds of the duke and the king gave Delaware a right to the whole river and its soil, we think that the non-assertion of any title by herself, the constant counter-assertion and action by New Jersey,—both taken in connexion with the anomalous, ungeographical and unnatural character of the boundary—its variance, in the same continuous stream, from the boundary above and below it; its total want of definition, and the impossibility of giving it any, as to place of either beginning or ending; the uncommon facility, not to say the irresistable necessity for usurpation and encroachment; all urge to the conclusion, if the conclusion be any way possible, that she did in point of fact abandon the Jersey half. Many witnesses, of whom we need say nothing except—that they all came from Delaware—tell us that since the Revolution, Delaware has always claimed and exercised jurisdiction over the river within the circle; that they never heard it denied or doubted in the state of Delaware. Both may be admitted. As to the first, the matter depends upon ante-revolutionary claim, not upon claim since the Revolution. We all agree that whatever boundary New Jersey had in 1776, that she has still. Respecting the second, lawyers of Delaware were not in a position where they were likely to hear much of the claims of New Jersey. Of course they never heard the Delaware title doubted in Delaware, any more than they would have heard it suspected in New Jersey. They knew what they knew, but not what they did not know. They did not know what happened before they were born, nor what happened in places from which they were absent and remote. New Jersey was not heard by them, and they did not speak loud enough to be heard by New Jersey. The exclusive jurisdiction of the state of Delaware, attempted to be proved, is in its nature a negative; it amounts to nothing more than this, that they, these witnesses, men of a single generation, living in one state of Delaware, did not know every thing which, in the long track of time, had taken place in another state of New Jersey. The legislative enactments given by us in evidence rebut the negative evidence of ante-revolutionary "exclusive jurisdiction," attempted to be set up for Delaware. We have not brought the sworn testimony of the profession in New Jersey, but it is clear that Mr. Wall and Mr. Green, both of them holding office under the United States, have considered that Delaware did not have such rights as she claims; for they have both given opinions in favour of Mr. Humphrey and against the United States under which they were acting. All the trials referred to by our opponents have been in Delaware; and there is no evidence in any one of them, on which side of the middle line of the river the process in them was served. In a river so broad as the

Delaware here is, having close to the Delaware shore the channel universally supposed to be the main one, and almost universally navigated; the large majority of the few cases where process appears to have been served on the river, would be on the Delaware and not on the New Jersey side of the line. They give, therefore, but little support to the Delaware claim. In no instance where the process is shewn to have been served on the Jersey side of the middle line, was there either resistance or trial. Of what judicial value—of what weight as precedents—the opinions of bound-bailiffs or of common sailors are worth, may be discovered, if it requires to be searched for, in the testimony of Mr. Janvier, taken by the United States. This gentleman who is brought to show practical illustrations of theoretical jurisprudence of more learned men, informs us that within his memory R. C. Dale, who was sheriff of New Castle county from 1803 to 1806, boarded a ship, with his posse, and arrested a person on board of her, after she had been run ashore on the Jersey side!

(The counsel then went into an argument upon the facts already stated, in order to shew that Mr. Humphrey had acquired a title to the island by possession: his warrant and survey were in 1784, from which time he was in possession until 1815, when dispossessed by a military force of the United States. This disseizin was a tortious one, and gave no title to the disseizor. Even if Delaware had a title to the island, she was not in possession in 1813, when she conveyed to the United States; and the counsel therefore assumed, that the transfer, being the transfer of a "pretence title,"—was illegal. The doctrine of election and repudiation under the act of February 7, 1794, was also urged, with other points which were of less importance.)

Then again, in 1784, when the survey was made for the Halls, the island was much nearer to the Jersey shore than now. That shore has been continually washing away since the formation of the island. The main channel of the river, the greatest volume of water, and greatest depth of water, then, was next the Delaware shore, however it may be at present. Now although the publick jurisdiction between two states on opposite sides of the river, having the river as their common arcifinious boundary, changes with the channel of the river, yet private rights acquired under the proper jurisdiction, before the change in the channel, are not annulled by the change of the current, nor transferred as publick domain to the other jurisdiction. The private right of property remains valid and secure through all changes of the channel of the river, if the land be not submerged or washed away. Whether therefore the island be, at this time, in New Jersey or in Delaware, it is still the property of Mr. Humphrey. It may have changed its sovereign: its owner is still the same.

But finally, the language of the duke's deed to Penn cannot be followed with the literality which a lawyer is disposed to give to every deed. "Land lying within the compass or circle of twelve miles about" the town of New Castle, would include land on the east just as much as on the north, south and west and therefore would include land in New Jersey, which the duke could not grant as well as that in Delaware which he could. It can only grant that "land lying within the compass or circle," which the duke had a right to grant, that is to say land in Delaware. By this grant of "land," neither the river nor soil of it passes. This the counsel of the other side have themselves asserted in regard to our proprietary warrant of 1784. Besides which there is an express grant of whatever islands, river and river-soil are conveyed. The circle, then, stops with the river edge. There is nothing to carry it to "land" across. The facts of the case force us to bring it but to this margin; and it is clear

from the Penns' own map, which is prefixed as an exhibit to the breviate of their solicitors in Penn v. Lord Baltimore, that this was the construction which the Penns themselves gave to it. Now throwing aside all other questions, it will be seen, by looking at the chart, that by even giving to Delaware what the duke's deed professes to grant her, that is to say, "all islands in the said river Delaware, and the said river and soil thereof lying north of the southernmost part of the said circle," she will not get the Pea Patch Island. A line drawn northward from the point where "the southernmost part of the said circle" touches the river, leaves this island on the outside. Give her, then, all she claims and she leaves us all we ask for.

## OPINION.

Mr. SERGEANT, the arbitrator, having heard the evidence and arguments, and taken due time to examine and consider the matter, delivered the following opinion on the 15th January 1848, in one of the rooms of the capitol at Washington, in the presence of the counsel of the respective parties, and also of a considerable assemblage of persons who thought fit to attend:

The question submitted by the United States on the one side, and James Humphrey on the other, is thus stated in the submission: "To decide the question of the title to the Pea Patch Island, as derived by the United States from the state of Delaware, and by the said James Humphrey, claiming through the said Henry Gale, deceased, from the state of New Jersey."

The importance of the case consists chiefly in this; that it involves the question of the boundary for nearly twenty-five miles, between the two states just named. It is true that the settlement of that boundary is not submitted, nor to be decided in the arbitration; New Jersey and Delaware not being parties to the submission, nor having agreed so to submit their rights. But it is also true that in conveying, the one to the United States, and the other to an individual, the island in controversy, they have necessarily communicated to the grantees the right to assert the title respectively conveyed to them, and to dispute the adverse title: and it is very manifest that this controversy turns mainly, if not entirely, upon the question of the limits and jurisdiction of the respective states. If the Pea Patch Island is within the state of New Jersey, the title is in Mr. Humphrey. If within the state of Delaware, the title is in the United States.

The consideration and respect due to these states, as members of the Union, in whatever may touch their rights and interests, seemed to require that as much publicity as possible should be given to the proceedings; and an intimation to that effect was promptly acceded to by the city and county of Philadelphia, in liberally granting to the arbitration the use, first, of the supreme court chamber, and afterwards, of the venerable Hall of Independence. The arbitrator was attended by the counsel of the parties, who had laboriously searched out the evidence wherever it could be found, and followed its production with an able and learned, as well as interesting, discussion on both sides. It is believed that nothing has been omitted in either respect; and that there is no reason to suppose that any thing in the shape of evidence or argument remains unexplored, which could throw additional light upon the subject. It remains for the arbitrator, after careful deliberation, and with the aids just mentioned, having come to a conclusion satisfactory to himself, to make his award. In ordinary cases his duty would be performed by simply executing the needful paper, and giving it the direction which is required, in order to render it, as demanded by the submission, "final and conclusive between the United States and the said James Humphrey, claiming under the said Henry Gale, deceased."

But the same motives of consideration and respect, already stated, for giving the utmost publicity to the proceedings; the nature of the controversy; the length of time it has been pending; the names that have been connected with it, from whom he will feel himself bound to differ in his views, or at least to appear to differ; and, he must add, the great confidence reposed in him by the parties in leaving the matter so long litigated to his sole determination—a confidence which forbids him to doubt his ability to decide it, but by no means relieves him from an anxious sense of the responsibility of the task he has, by their invitation, undertaken—all these things concur to impose upon him the duty, as it is also his desire, to present, in an intelligible and somewhat permanent form, the grounds of his decision, for the satisfaction of the parties, and the examination of those who may feel any curiosity about the case, or any interest in it. He is fully aware that his opinion is of no authority whatever, except for the single purpose as to which the agreement of the parties has made it conclusive; that is, the question of title between them. He will, therefore, proceed to state these grounds as briefly as may be consistent with perspicuity.

The island in controversy, called the "Pea Patch," lies in the river Delaware, rather less than five miles from New Castle, in a southeastwardly direction. The most satisfactory evidence respecting it was given by Wilson M. C. Fairfax, Esq. of the United States coast survey, being from actual and careful survey and measurement. It was in writing and not under oath, but was received by consent of both parties; and there is no reason to doubt its accuracy. According to this witness, the length of the island is 1,083 yards, its average breadth 461 yards, and its area 87$\frac{60}{100}$ acres. The mid-line of the island, at its north extremity, is 2,090 yards from the Delaware shore, and 2,130 yards from the New Jersey shore. The mid-line at the southern extremity is 2,197 yards from the Delaware shore, and 1,875 yards from the Jersey shore. The middle line of the river Delaware, he says, run through the island, would throw 21$\frac{9}{10}$ acres on the Delaware side, and 65$\frac{7}{10}$ acres to the New Jersey side. Such a line, he states, would pass through the island 46 yards north-east of the southwest extremity of the wharf at the lower end of the island which projects towards the Delaware shore, and 20 yards eastward of the middle point of the upper end of the island. With respect to the water, the witness says, the main and deepest channel of the Delaware river opposite the Pea Patch is on the Jersey side. The greatest depth of water in the channel on the Jersey side is 40 feet, and on the Delaware side 25 feet. The average depth of water in the channel of the Jersey side is 32 feet, and on the Delaware side 23 feet. But to take the entire channel on either side of the island, no vessel drawing more than 19 feet water, at low water of spring tide, can pass through. The Jersey channel is the shortest and widest, and both about equally curved.

Witnesses have been produced to show which is the main channel of the river, as to which they have differed in opinion. The greater part, probably, have thought the western or Delaware channel to be the main channel. They have stated that the bottom on that side is softer and safer, as well as better holding ground than on the east, though they state, also, that the eastern channel has undergone changes at different periods. Some of them have stated, too, and no doubt truly, that the shore on the Jersey side, opposite the Pea Patch, has been wearing away considerably for some years past. And, finally, some of them, judging only from sight, have asserted the island to be nearer to New Jersey than to Dela-

ware. As to this, however, the evidence from survey and measurement, already referred to, is much more to be relied upon than opinions like these.

In the view to be taken of the case, and with reference to the grounds upon which it will be decided, it is not necessary to go into the particulars of the testimony just adverted to. The material facts, about which there can be no dispute, are these: The island is in the river Delaware, with a deep channel on each side; is far below the low water mark on both sides; is not connected with the land either of New Jersey or Delaware; and is at all times of tide surrounded by water. There is a shoal, called the "Bulk-Head Shoal," from the northern end, towards the northward and eastward, but it is never bare; and is, besides, pierced by a channel of such width and depth, that vessels of heavy draught of water can pass through it. The only question raised about it, and that not at all material, is, whether large sized vessels can beat through it from the western channel to the eastern, or in the opposite direction, against a head wind. The fact is, that vessels can pass entirely round the island, upon the waters of the river, at all times of the tide. The island is in the waters of the Delaware.

It is proper further to state, that this island is of comparatively recent formation. Maps and charts, as late as the middle of the eighteenth century, do not mention it. Kensey Johns. Esq. who was eighty-eight years and four months old at the time of his examination (Nov. 2d, 1847), a witness not more venerable for his years than for the high stations he has held, and the uniform excellence of his character and conduct through his long life, states that he had resided in New Castle from the year 1780 till that day. He then says, "I do know it, (the Pea Patch,) and have known it since the year 1780. At first it appeared about the size of a man's hat. In 1813, when the United States took possession of it, it had grown to be a large island. It was not worth a cent to a private citizen; the expense of banking would have been more than it was worth." The general conclusion seemed to be on both sides, that it had not made its appearance earlier than 1780, which in the argument, seemed to be an agreed time of its beginning to be visible, and was probably nearly correct. It would seem, with some allowance for what must be measurably hypothetical, to have sprung up from the bottom, in the deep channel of the river, dividing that channel into the two channels, whose respective titles to the dignity of the "main channel," have been so much controverted in the evidence and the argument. From other evidence it appears that, until the United States made some embankment, the island was nearly, if not entirely covered with water at every tide.

The main point, however, is that before mentioned, which will not be affected by any errour in the conjecture just stated. From its first appearance, the island has always been where it now is, that is to say, in the deep river, below the low water mark, surrounded by navigable water, and separated at all times from the land on both sides.

The description and account thus given of the subject of controversy, are deemed to be sufficient for the present, to introduce and render intelligible the several questions to be considered and decided. They are indisputable, it is believed, and stand as facts beyond the reach of the conflicts in the evidence as to other matters, not deemed to be important, and therefore laid aside.

We are thus brought, after stating what the thing in controversy is,—enabling us to judge by what kind of title such a thing can be claimed and held,—to the examination of the case made out by the respective parties. And it is proposed to begin with the case of Mr. Humphrey, as most conducive to the right understanding of the questions to be considered.

Has Mr. Humphrey made out a title?

He begins, taking the evidence in chronological order, with the copy of the record of two warrants from the proprietaries of West New Jersey, one dated November 4th, 1743, for 600 acres of unappropriated land in West New Jersey, the other dated August 7th, 1782, for 5,000 acres: a return of a survey under them for Edward and Clement Hall, October 8th, 1874, "of an island in the river Delaware, called the Pea Patch, situate in the county of Salem, about one mile west of Finn's point, in Penn's neck, and is about west of the mouth of Salem creek, &c. containing 178 acres of marsh, sand bank, and mud flats; New Castle distant about 4½ miles." The record adds: "November 3d, 1784, inspected and approved by the council of proprietors, and ordered to be recorded."

This record, authenticated as it was, was good evidence by the laws of New Jersey, and therefore was good evidence in the arbitration. It was accordingly admitted.

Many objections were made to the warrants, and especially to the survey, which need not be stated. The answer to them all was this, that if the proprietaries of West New Jersey were the owners of the island, and had power to grant it, it was for them, and for them only, where there was no interfering right, to object to irregularities in the warrants or in the surveys under them. By accepting and approving the return of survey, and ordering it to be recorded, they waived all such objections, and no one else could make them, unless he had a right which was interfered with. The survey must, therefore, be taken to be good, and to have vested the title in the Messrs. Hall, if the proprietaries had a right to grant. From Messrs. Hall, the title, by mesne conveyances, was regularly derived to Mr. Humphrey, so as to vest in him all the right they had, which, as we have seen, was all the proprietaries could give, neither more nor less.

The question then is, what right had the proprietaries? When Judge Baldwin gave his charge to the jury in the case of Gale's Lessee v. Behlin [Case No. 5,189], in the circuit court of the United States for the district of New Jersey, (which will be more particularly noticed hereafter,) the case of Martin v. Waddell, 16 Pet. [41 U. S.] 367, had not been decided by the supreme court of the United States, where it was brought by writ of errour to the circuit court just mentioned, upon a judgment there rendered, Judge Baldwin presiding. The decision of the supreme court was in 1842. Being upon a question within the jurisdiction of that high court, it is deemed to be of the highest authority in all inferiour tribunals, and, of course, in this, in point of authority, the most humble of all. The point there decided —to say nothing of the learned and satisfactory reasoning of the chief justice (Taney) in delivering the opinion of the majority of the court—the very point decided is, that after the surrender to the crown in 1702, by the proprietors of East New Jersey, of the powers of government, they had no right in the navigable rivers within the charter limits of New Jersey, nor to the soil under them, and have had none since. In this respect, the West New Jersey proprietaries stand upon the same ground precisely. Both surrendered the powers of government at the same time, and, it is believed, in the same terms. The decision of the supreme court equally settles the law for both. It follows, that the West New Jersey proprietors, at the date of the warrants and survey, and acceptance of the survey, had no right in the river Delaware, even though it had been within the charter limits of New Jersey, (which will be hereafter examined,) and could give no right in the island to Messrs. Hall. For, upon the survey itself, it appeared

that the island was "in the river Delaware," and that it was "about one mile" from Finn's point, the nearest land on the Jersey coast.

The same point was decided in the same way by the highest judicial tribunal of the state of New Jersey. Arnold v. Mundy, 1 Halst. [6 N. J. Law] 1; Shepard v. Leverson, 1 Penn. [2 N. J. Law] 391. The first of these cases is said to have been upon a location made to try the right. In the other it came up incidentally.

The concurring judgments of the supreme court of the United States, and of the judges of the highest court of New Jersey, in such a matter, certainly do amount to binding authority. In accepting them as such, however, it is not to be understood that any doubt is entertained of the solidity of the grounds upon which they were made. It may be deemed presumptuous, perhaps, even to suggest that they are approved, where approval is of so little consequence, indeed so entirely valueless, in comparison with the proper and intrinsick weight of the judgments of these high courts, and especially of the supreme court of the United States. It may be allowable, nevertheless, to add, in vindication only of the effort to fulfil the whole duty confided to the arbitrator, that if the question were new, and to be examined without the aid of the great light thrown upon it by the opinion of the supreme court of the United States, having fully and deliberately examined the question, he should, upon original grounds, come to the same conclusion that he most willingly yields to the rightful authority of the judgment. It seems contrary to reason, and against the spirit of our institutions, that great publick rights, in which all have an interest and concern in common, should be without a publick guardianship, disinterested enough to regard all with impartiality, and powerful enough to protect them in the enjoyment of their privileges. Government is the proper trustee, everywhere existing with the consent or allowance of the people, and, in our representative republicks, by free election, with the power of change. If, in the discharge of such trust, portions might be disposed of, so as to diminish the common fund, still there would be no contradiction, as is supposed, of one or more of the grants by the state of New Jersey, for it must be presumed that such disposition is itself in some way for the common benefit, and on terms the least injurious to the publick. A private proprietor, on the contrary, looks only, and rightfully looks only to his own advantage.

The conclusion upon this point is, that the survey was merely void, that it gave no title, and that no title can be derived from it. the proprietors themselves having no right in a navigable river, nor any power to grant.

The next evidence of title exhibited and relied upon by Mr. Humphrey, is an act of the legislature of the state of New Jersey, dated November 24th, 1831, granting to Henry Gale, his heirs and assigns, "all the right and title of the said state of New Jersey to the said island called the Pea Patch, situate in the river Delaware, in the township of Lower Penn's Neck, in the county of Salem and state of New Jersey, as mentioned and described in the before mentioned survey," meaning the survey of 1784.

This act, it will be seen, was passed about seventeen years after the present controversy began, and during the time the United States were in actual possession of the island. The counsel of Mr. Humphrey, in the course of the argument, objected to the cession of the island to the United States by the state of Delaware, on the ground that the state was not in possession, but it was adversely held and possessed. and therefore could not be lawfully conveyed. The same objection applies to New Jersey. Whether such is the law of

New Jersey or Delaware, is not known. It is believed not to be so. But it is not material to inquire into the matter, nor to examine particularly the evidence of possession, for a reason which seems to be a sufficient answer. Both acts of the respective legislatures, besides operating as grants, being passed with all the forms and sanctions of the constitution, were also acts of legislation, and, no third right intervening, could pro tanto repeal the general law, and give the required ability. Such would be their effect. If, then, the Pea Patch Island was within the limits of New Jersey, and subject to her jurisdiction, there is no doubt of the sufficiency of the grant to pass the title of the state. The same may be said of the state of Delaware, whether they had champerty laws or not. It remains, too, to be shown that a sovereign state can be affected by adverse possession, unless so long continued as to found a presumption of grant.

It may be further remarked, that in this act the state of New Jersey does not assert a right or title. In the preamble the act recites the survey of 1784, the mesne conveyances to Henry Gale, and then proceeds as follows: "And whereas, it hath been suggested that the state of New Jersey hath some title thereto, and by reason thereof doubts have arisen concerning the title of the said Henry Gale," and then goes on to grant "all the right and title of the said state of New Jersey." This remark, it must be observed, does not affect the legal sufficiency of the grant to pass all the right of the state, and entitle Mr. Humphrey to claim under it. It is good between him and the state of New Jersey, and entitles him to vouch in his own behalf all the well founded claims of the state. But the grant is not in the ordinary form of a conveyance of land. It is only a quit-claim, which one may give to quiet doubts, whether he has a right or no right. The value of the fact is only as it shows, that as late as 1831, when the island, by great expenditures upon it by the United States government for works of publick defence, had become an object of general attention and interest, the state of New Jersey made no assertion of right. The act, for a mere nominal consideration, simply relinquishes whatever right, if any, the state may have. And this remark may be further extended. It is believed that there has been no evidence to show that the state of New Jersey ever has claimed the title to be in her. It may be admitted that the proprietors of West New Jersey did assert a right by the acceptance and approval of the survey. But they did so, in their own behalf. adversely to the state, under a claim which is now settled to have been unfounded.

In the recital, however, there is a statement entitled to some attention, in connection with a part of the charge of his honour the late Judge Baldwin, in the ejectment tried in the circuit court for the district of New Jersey. The recital is, that, by virtue of the survey, "Edward Hall and Clement Hall became seized and possessed," and that, by divers mesne conveyances, Henry Gale "hath become seized and possessed." The natural and the legal import of this language is only this, that the constructive legal possession of vacant land follows the right, and it must be admitted that, if the survey had given the right, he would have been, in this sense, in possession. But the proprietors themselves having no right or possession, could give none to their warrantee.

Judge Baldwin, in the latter part of his charge, comes to the following conclusion: "In the year 1784, this island was surveyed for Edward and Clement Hall on a West Jersey proprietary warrant, under which it was held until their title became vested in the plaintiff. From this time, he stood in place of the West Jersey proprietors, entitled to all their rights by prescription against the crown, against

the Penns and the state of New Jersey; and, in his own right, by his possession, such as it was, entitled to the benefit of any limitation which had commenced or begun running from the date of the survey. As there was no adverse possession or claim, his legal seizin or possession continued till his dispossession by the United States in 1815, a period of thirty-one years, which would bar the right of entry of any adverse claimant; and, connected with the general claim of the proprietaries of New Jersey to the islands in the Delaware from 1739, would make the title good by a prescription of seventy-four years of quiet enjoyment, adverse to any right under the deeds of the Duke of York to William Penn." He then concludes that the title under Gale is derived from the proprietors and is good, and, as has been seen, adverse to the state of New Jersey.

Unnecessary criticism upon the charge of Judge Baldwin, is forbidden by the respect due to the memory of a learned and able man, who so long filled an eminent judicial station. The several legal principles contained in the paragraph just quoted are neither affirmed nor disaffirmed. Nor is it required to point out the one great errour which vitiates the whole of the charge. It has already been done authoritatively. The case of Martin v. Waddell, 16 Pet. [41 U. S.] 367, had not then been decided. The decision since has established a different doctrine from that of Judge Baldwin, upon full discussion and deliberate consideration, and in concurrence with the judgments of the courts of New Jersey, that from 1702, the proprietors never had any right in navigable rivers, and, as there will be occasion to consider more fully hereafter, the right of the state did not come into existence until July 4th, 1776. Its origin is thus distinctly marked, being connected with the great publick event of that day, which will never be forgotten, as it was the birth-day of a nation, and registered with an exactness of which there is probably no other example in the annals of the world.

This then leads directly to the inquiry, whether the Delaware river was ever within the charter limits of New Jersey, in that part of it where the Pea Patch Island has since grown up. If it were, the right would have become vested in the crown by the surrender of 1702, would have so continued until July 4th, 1776, and then would have passed to the state of New Jersey as a part of her sovereignty, acquired on that day by severing her connexion with Great Britain, and assuming to herself all the powers of government. The derivation would thus have been from the crown, though not by grant.

To maintain that the part of the river in controversy was within the charter limits of New Jersey, the counsel for Mr. Humphrey have produced the following deeds and papers: Patent, March 12th, 1663-4, from Charles II. king of England, to his brother the Duke of York, his heirs and assigns, for a large tract of territory, including what is now the state of New Jersey, the last boundary of which (now the west boundary of New Jersey) is as follows: "and all the lands from the west side of the Connecticut, to the east side of Delaware Bay."

Lease and release, June 23d and 24th, 1664, the Duke of York to John, Lord Berkely, and Sir George Carteret, reciting the grant from the king to the Duke of York, grant and convey "all that tract of land adjacent to New England, and lying and being to the west of Long Island, and Manhitas Island, and bounded on the east part by the main sea, and part by Hudson's river, and hath upon the west Delaware bay or river."

Patent, June 29th, 1674, Charles II. to the Duke of York, for New Jersey by the same description as before. Between this patent and the former one, New York had surrendered to the Dutch, and it is stated that the people of New Jersey sent deputies to New York, and

swore allegiance to the states general and the Prince of Orange. In February, 1674, a treaty of peace was signed between England and the states general, by which New York and New Jersey were restored to the English. This deed is supposed to have been made to remove all doubts which might arise from these occurrences.

There is no necessity for tracing the conveyances further. The title is regularly derived to the proprietors of East New Jersey, and West New Jersey, between whom the province was held in the portions it had been divided into by a partition thereto made, and by the lines and boundaries then fixed.

In 1702, the proprietors of New Jersey surrendered to the crown the powers of government, and thenceforth were only private proprietors.

Returning, then, to the question, whether the Delaware river at the part of it now in controversy was within the charter limits of New Jersey, there can at this time of day be no question. It was not within the grant, and as far as is known, there has never been a dissentient opinion.

In 1721, the question was submitted to the law officers of the crown by the commissioners of trade and plantations. The opinion of Robert Raymond, attorney general, and Philip Yorke, solicitor general, will be found in the first volume of Chalmers' Opinions (page 59). They say as follows: "We have perused the said clauses," (in the charters of New Jersey and Pennsylvania,) "and have been attended by the agents of the parties who claim the province of Pennsylvania, and their counsel, who laid before us a copy of the letters patent granting the said province, and have heard what hath been alleged on both sides; and, upon consideration of the whole matter, are of opinion that no part of Delaware river, or the islands lying therein, are comprised within the granting words of the said letters patent, or of the said annexed extract of the grant of New Jersey; but we conceive the right to the same still remains in the crown." The opinion seems to have been acquiesced in, for there appear to have been no further proceedings before the commissioners of trade and plantations, nor before the king in council, whom the commissioners were sometimes employed to aid in colonial investigations; and if it should be suggested that there were no agents present on the part of New Jersey, the answer is, the question was one and the same as to both, for Pennsylvania was bounded by the Delaware on the east, just as New Jersey was on the west.

Some stress might, perhaps, be laid upon the nature of this opinion, partaking, as it does, of the character of a judicial proceeding, and some, too, upon the names of the eminent men by whom it was given, and the high stations they afterwards adorned. But this is needless. The law of nations furnishes the same rule of decision. Here was the crown owning a large territory on both sides of a navigable river, (for, at the time of the latest of the patents to the Duke of York, neither the grant of the three lower counties nor of Pennsylvania, had been issued,) and it makes a conveyance of territory on one side of the river, bounding on, or bounded by, the river. Is the river, or any part of it, included in the grant? This is the very question which came before the supreme court of the United States in Handly's Lessee v. Anthony, 5 Wheat. [18 U. S.] 375-385, in the year 1820. The decision of the court was delivered by Chief Justice Marshall, that the grantor retains the river within his own domain, and the grantee extends to the river only, and the low water mark is his boundary. The same point was decided, in the same way, by the supreme court of New Jersey, in Arnold v. Mundy, 1 Halst. [6 N. J. Law] 1, in 1821, with only this difference of expression, "the grant is to the edge of the river only," leaving a doubt

whether it is a line shifting with the rise and fall of the tide. The same point, as to the limits of New Jersey on the Delaware river and bay, namely, that it was bounded by the low water mark on the west side, was decided by Judge Washington, in Corfield v. Coryell [Case No. 3,230], in 1823; by Judge Baldwin, in Bennett v. Boggs [Id. 1,319], in 1830; and it was approved by him in Gale's Lessee v. Behlin [Id. 5,189], in 1833-4. It must, therefore, be considered as settled that, by her charter limits, the territory of New Jersey extended only to the low water mark of the Delaware river on the east side, and included no part of the river. It is, accordingly, so considered.

The states of Pennsylvania and New Jersey, as has been seen, being both bounded by the low water mark on their respective sides, and the river itself belonging to the crown, upon the Declaration of Independence, a new state of things arose. The right of the crown was extinguished, and the river lay vacant, a boundary between them. "When," says Chief Justice Marshall (Handly's Lessee v. Anthony, 5 Wheat. [18 U. S.] 375-379), "a great river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream." The states of Pennsylvania and New Jersey adopted this rule. In 1783, a compact was made by commissioners mutually chosen, which was ratified by acts of their respective legislatures, in 1785. By this compact, concurrent jurisdiction upon the water was given to both states, with some restrictions not necessary to be detailed; some islands were specifically allotted to each state, probably from motives of convenience; and it was agreed that the rest should belong to the state to which they lay nearest, and that all the islands which should thereafter be formed in the river, should be governed by the same principle. This agreement was limited, southerly, to "where the circular boundary of the state of Delaware toucheth upon the same," (Delaware river.) As between Pennsylvania and New Jersey, this compact was formed upon great deliberation, and with a full knowledge of the subject, as must be believed from the high character of the commissioners on both sides, and is in conformity with the principles afterwards laid down by the supreme court of the United States in the case, before cited, of Handly's Lessee v. Anthony.

If, then, that part of the river Delaware lying between the states of New Jersey and Delaware, which includes the Pea Patch Island, was in the crown on July 4th, 1776, "the original property not being in either," it would, on that day, have become vested in the two states. In that case, New Jersey would be entitled to the eastern portion of the river, though not within her charter limits; succeeding to that extent to the rights of the crown, which had been divested by the Declaration of Independence. Delaware, in the same case, would be entitled to the western portion. Both would commence their right from that day. How the line would be drawn, or whether it would place the island on the side of the one state, or of the other, it is not material to inquire; for the view to be taken renders it unnecessary.

The question, having already shown that the "original property" was not in New Jersey, is thus reduced to the single inquiry, whether on the eventful day referred to; the right to that part of the river was in the crown of England, or whether the "original property" was not in the province or colony which then became the state of Delaware. The "original property" of Delaware, that is, her title previously acquired and continued up to that day, becomes, therefore, the subject of examination, and has been accordingly examined, carefully and deliberately. The evidence, as far as necessary, will now be stated.

The title begins with two deeds of August 24th, 1682, commonly termed the deeds of feoffment, from James, Duke of York, to William Penn. The first of these deeds grants and conveys to Mr. Penn, his heirs and assigns forever, as follows: "all that the town of New Castle, otherwise called Delaware, and all that tract of land lying within the compass or circle of twelve miles about the same, situate, lying and being upon the river Delaware, and all islands in the said river Delaware, and the said river and soil thereof, lying north of the southernmost part of the said circle of twelve miles about the said town." The deed then covenants for further assurance, and appoints John Moll, Esquire, and Ephraim Herman, gentleman, his attorneys, jointly and severally, to enter into and take possession and seizin of the premises, and to deliver possession and seizin to Mr. Penn, his heirs and assigns.

The second of these deeds conveys to Mr. Penn all the territory from the south line of the preceding deed, that is, from "twelve miles south of New Castle, and extending south to Capin Lopin," meaning Cape Henlopen. In this deed, there is no grant of "islands in the said river Delaware, and the said river and soil thereof."

These two deeds, it will be perceived, embrace the whole of the territory of what were called the "Three Lower Counties," now the state of Delaware.

On October 28th, 1682, the attorneys appointed in the deeds of the Duke of York, made livery of seizin to Mr. Penn of the first of the tracts, of which a record is made and is still preserved, and is, in all respects, exact and particular. On November 7th, 1682, as also appears of record, livery was made of the tract in the second grant to Captain William Markham, Mr. Penn's attorney. The declaration is signed by twelve witnesses, "in Delaware river," probably on their passage up from below the twelve miles. Of both a record was made, and still remains, in all respects exact and particular.

There is this remarkable difference in respect to the two grants; that, in the first, the livery is stated, besides "twig and turf," to be of "water and fowl of the river Delaware;" in the other, it is of "the land, soil and premises" in the indenture mentioned.

They state, also, that Mr. Penn remained in quiet possession. John Moll, the attorney appointed by the Duke of York to deliver seizin, in his certificate, also recorded, is still more precise. Of the livery, under the first deed, he says, they did give and surrender to the said W. Penn, Esq. actual and peaceable possession of the fort at New Castle, by giving him the key thereof, to lock upon himself the door; which being opened by himself again, "we did deliver also unto him one turf, with a twig upon it, a porringer, with river water, and soil, in part of all what was specified in the said indenture," &c. As to the other, he says that a few days after, they went to the south side of Apoquiniming creek, by computation beyond the twelve miles, and there made livery of seizin of the lower part. The distinction thus made, it may be necessary hereafter to refer to.

From a book kept in the government at New York, begun in 1682 and ending in 1683, a copy has been produced of an entry or paper, of course made during that period, from the commander and council, beginning thus: "The record of the commander and council; declaration on Esquire Penn's grant for New Castle, St. Jones and Whorekills, by the commander and chief, in council." It then proceeds to recite the two deeds from the Duke of York to Mr. Penn, of August 24th, 1682, setting out, at large, and accurately, the description in each; states the appointment of attorneys to deliver free and actual possession, and adds: "as by the said indentures here produced, and shown to us, and by us well approved and entered in the publick records of this province, doth and

may more at large appear; and we being thereby fully satisfied of the said William Penn's right to the possession and enjoyment of the premises." The paper which is addressed "to the several justices of the peace, magistrates and other officers, at New Castle, Saint Jones, Deale, also Whorekill, at Delaware," or within any of the bounds and limits above mentioned; and then after thanking them for their good service, during the time they had remained under his royal highness' government, dismisses them, "expecting no further account than that you readily submit and yield all due obedience and conformity to the powers granted to the said William Penn, in and by the said indentures, in the performance of which we wish you all happiness."

John Moll, in the certificate before mentioned, after stating the livery of seizin already referred to, adds this statement: "Which acting of us was fully accepted and well approved by Anthony Brockhold, then commander in chief, and his council at New York, as appears by their declaration, bearing date November 21st, 1682, from which jurisdiction we had our dependence all along, ever since the conquest, until we had made the above related delivery unto Governour William Penn, by virtue of his royal highness's order and commands."

On October 28th, 1682, as appears from evidence of record, sundry inhabitants of the town of New Castle, upon Delaware river, having heard the first of the two deeds read, and having seen the possession delivered by the Duke of York's agents, "whereby we are made subjects under the king to the said William Penn," make a solemn promise, in the presence of God, to yield him obedience, and to live quietly and peaceably under his government. Soon after, an act of naturalization was passed.

The objection to these two deeds, however, is, that the Duke of York himself had, at that time, no grant for the premises from the crown, and therefore had no title to convey. It is certain that no such grant has been produced, and it is assumed, as a fact, that no formal grant had been made to him by the crown. But, if the question were open, there would be grounds for believing that the Duke of York was some how empowered to deal with the territory on the west side of the Delaware river, and the river itself, as connected with the operations he was conducting to protect or recover it from the Dutch. Not that being a subject, he could acquire any right for himself by conquest, which cannot be pretended, but that in such a war, for enabling him to quiet the inhabitants, or strengthening the defence of the country, it was not unnatural nor unreasonable to suppose that he might be entrusted with a large discretionary power, and even with rights in himself for its better execution, especially considering the relation he stood in to the king, and that he was himself the heir presumptive to the crown. John Moll says, they always "had their dependence from the jurisdiction of New York," which was the Duke of York's government, and it was by that jurisdiction we have seen that the actual transfer of the powers of government was made to William Penn, which he began immediately to exercise. There is other evidence to the same effect. The Duke of York and his governours did make grants along the Delaware, and did confirm titles derived from the Dutch and Swedes. There are instances of titles beginning with the Swedes, confirmed by the Dutch, afterwards confirmed by the Duke of York and his officers, and always treated with respect. But there is another transaction of those times, of publick notoriety, more important than any of these, not only on account of its magnitude, but also for the judicial interpretation it has received. In 1681, William Penn obtained his charter for the province of Pennsylvania, bounded on the east by Delaware river, from twelve miles north of New Castle town, and on the south by a circle

drawn twelve miles north of New Castle. On August 21st, 1682, the Duke of York gave him a release of all his claim upon the province. In the recital it is stated that he "is willing and pleased to confirm and make any further assurance of the said tract of land and premises unto the said William Penn and his heirs." This deed has always been deemed a part of William Penn's title; and, furthermore, it has been held that he took subject to grants previously made or confirmed by the Duke of York's government. The Swedes held a large body of land immediately below the city of Philadelphia. The titles derived from them are still respected. They owned also the land now occupied by the city of Philadelphia. William Penn obtained it from them by exchanging lands on the Schuylkill. And yet there was no formal grant from the crown to the Duke of York.

But it is unnecessary, for a reason that will presently appear, to pursue this inquiry further. Perhaps, indeed, the Duke of York, by subsequently accepting a patent from the crown, and those deriving from him, if they claim under that patent, must be deemed to be concluded by it from setting up any prior title in the Duke of York.

Be that as it may, the important fact deduced from what has been stated, and leading to consequences in law which will be more fully developed as the history advances, is this: that it was under these deeds, by the description and boundaries contained in them, and none other, and with the possession and seizin then delivered, that the three lower counties became, at least de facto, a province or colony, and acquired a name and identity which they maintained thenceforward for a century, less only six years, and then, of their own will, exchanged for the higher title of a sovereign and independent state. The same community still exists after nearly three quarters of a century more, with only such modifications as it has chosen to make in the mode of its existence, and as it rightfully might make, but still preserving its identity as the same corporate body which first had its being in the year 1682. The province was, and always continued to be, an unit.

Immediately after, the freemen began their work of government by acts of legislation. The first act (7th December, 1682) was the "Act of Union." In the volume of laws referred to, this act is immediately preceded by the two deeds from the Duke of York to Mr. Penn, set out at large. The preamble recites the patent for Pennsylvania, and the release from the Duke of York. It then goes on to set forth the two deeds from the Duke of York for the three lower counties, giving in full, and accurately, the description in each, and especially in the first, the words "as also the said river of Delaware, and soil thereof, and islands therein;" and states that the freemen of those counties have desired to be annexed to Pennsylvania. The enacting part follows, providing for the union, and for the naturalization of such of the inhabitants as were foreigners. Then follow sundry other acts of legislation in the same year, constituting the body of laws well known by the name of the "Great Law." They profess to be enacted by the deputies of the freemen of the province (Pennsylvania) and the counties aforesaid (the three lower counties.) The legislature was, indeed, constituted of equal numbers from the province and counties. To understand the whole bearing of this evidence, it must now be remembered that these laws were to be transmitted and delivered to the privy council in England, and, if disapproved by the crown within six months from the delivery, and so declared, were to become void; otherwise, to remain and stand in full force, "according to the true intent and meaning thereof." The "Act of Union" was, of course, submitted to the council, and approved by the crown. Looking at the recital and enactments.

of that act, and its preamble, it is impossible to avoid saying that the crown assented to them, thus acknowledging the validity and legal operation of the two deeds from the Duke of York, the boundaries defined in them, the possession and right of possession according to those boundaries, and the rightful exercise of the powers of government under them. An existing colony was thus acknowledged as rightfully created, and lawfully enjoying the powers and privileges of a colony by known and settled boundaries; and this acknowledgment was by all who had an interest. New Jersey had none, Pennsylvania had none, the Duke of York had none. The new province encroached upon none of them; Lord Baltimore asserted a claim on the land, but it was afterwards decided to be unfounded. The crown alone could object, and the crown assented. This assent, let it also be borne in mind, was not an informal and hasty one, nor upon insufficient knowledge. The king was in the exercise of his royal power, was aided by his privy council, and had full information before him of all the facts necessary to enable him to understand what he was doing. That he could, if so minded, have retracted his assent, it would be difficult to maintain. But he never did retract his assent, nor intimate any disposition to do so.

On March 22d, 1682–3, Charles II. made a grant by patent to James, Duke of York, of the same premises which had about seven months before been conveyed by the Duke of York to Mr. Penn. This deed in its description is the same as in the two deeds of August 24th, 1682. It describes separately and grants separately, the two parts of the lower counties as in those deeds. The only difference is, that in the former, there are two instruments; in the latter, only one.

The original patent was here produced—brought from England some years ago by the late J. R. Coates, Esq. (who was an agent of the Penns) where it was given to him by John Penn, Esq. a lineal descendant of William Penn, from among the title papers of the Penn family; rather, it was understood as a thing no longer of use to him, which might gratify curiosity in Pennsylvania and Delaware, than for any other purpose. At Mr. Coates's death it went into the hands of J. G. Morris, Esq. who has carefully preserved it, and now comes to us from the possession of Mr. Penn, with a presumption that it has been there accompanying his possession as a part of his title.

Of this deed there have also been produced various exemplifications; one from the rolls in England, one from the records in Delaware, a copy, sworn to be a copy, before the lord mayor of London, in 1735, and perhaps others. It is referred to, also, in the Votes of the Assembly. The original, or a sworn copy or exemplification of it was an exhibit accompanying the bill of the complainants in the case of Penn v. Lord Baltimore, filed in the high court of chancery of England, in the year 1735, and was in evidence in that case, and the original was offered to be, and probably was, produced.

If this deed had preceded the deeds of the Duke of York, the regular derivation of the title from the crown to the lower counties could not have been disputed, and there would have been no question open but upon the construction of the terms of the patent, as to what was conveyed. But above a century ago, in the case just cited of Penn v. Lord Baltimore, the defendant set up the argument against the Penns, supposed to be derived from this order of the instruments, "that the grant to the duke being made after the deed by the duke to Penn, this grant must have been for the duke's use, and not for Penn's." The answer on the other side was, "We have a fact that will determine that case; for we have the very original charter itself, under the great seal, in our custody, ready to produce, which if the duke

had intended for himself, and to defeat our title by, he would have kept, and not Mr. Penn, who was at this time of passing it, and for a considerable time longer, over in America." These things are gathered from a large folio printed book, (belonging to Thomas Gilpin, Esq.) produced on the part of the United States, which contains the pleadings and evidence in the case, and is called in the statement the "Breviate." The case was decided by Lord Hardwicke, in 1750, and is reported in 1 Ves. Sr. 444. As the decision is deemed to be of great weight in every aspect, and made a final end of all controversy in England, (for there never has been a dispute since,) and thus fixes a new epoch in the history of the province, it will be conducive to the right understanding of its proper bearing upon the immediate subject of controversy, to look back upon the earlier evidence which has been produced upon the hearing of the present case.

The foundation of the new province upon the basis of the deeds from the Duke of York, the exercise of legislative power, the declaration of allegiance in New Castle, and the union with the province of Pennsylvania, all approved by the crown of England, have already been seen. The union appears to have been only a sort of league, betraying a want of cordiality in the beginning, and leading very soon to uneasiness and dissatisfaction; and after a few years of restlessness and irritation, they finally separated, with Mr. Penn's consent, in 1703. In the following year an attempt was made to bring them together again, and the people of the lower counties would appear to have been willing; but the people of Pennsylvania would not consent. From 1703, therefore, they became separate provinces, to all intents and purposes, (except that the government powers and right of property in both were in Mr. Penn,) and so continued till the Revolution. In this respect Judge Baldwin was misinformed, and supposed the union to have remained uninterrupted.

Very soon after the deeds, Lord Baltimore set up a claim to a large part of Pennsylvania, and to the whole of the lower counties, quite to the Delaware river, upon the allegation that they were embraced in his patent. In 1685, the council, to whom the jurisdiction belonged, decided against him, directing a line to be run north and south, which is the present western line of the state of Delaware. Soon after, an agreement was entered into between Mr. Penn and Lord Baltimore, for settling all disputes between them.

In 1692, Mr. Penn was removed from his government, and Benjamin Fletcher was appointed by the crown. The alleged ground for this measure was, that disorder had occurred in his government. There was no question about title, nor was either province disturbed. They went on as before. In 1694, Mr. Penn was restored, and the government descended to his children. There has been a very general belief, that the real offence of Mr. Penn was his supposed regard for the Stuart family, and particularly for James II. then banished from the throne and kingdom.

In and about the year 1711–12, a surrender of his government powers to the crown was contemplated by Mr. Penn, and it is understood that a negotiation for the purpose was considerably advanced, when his capacity to proceed further was arrested by illness, which prostrated his mind and memory for the remainder of his life. Pending the treaty, the crown consulted the attorney general, Edward Northey, and his opinion, as reported by him, is in Chalmers' collection (volume 1, p. 32), dated February 25th, 1711–12. Mr. Northey, among other things, says, "and he has made out to me his title thereto," that is, to the government of Pennsylvania, and of the "town or colony of New Castle, alias Delaware." This was in the time of Queen Anne.

In 1717, the Earl of Sutherland, alleging that he was a creditor of the crown to the amount of £20,000, applied for a grant of the three lower counties. It was referred to the attorney and solicitor general, Edward Northey, before mentioned, and W. Thompson. They made an elaborate report, which is published by Chalmers (Id. p. 39), dated October 28th, 1717. They heard the parties, who were before them—the Earl of Sutherland on one side, and on the other, "Mr. Penn's mortgagees and other purchasers under him." Mr. Penn took no part. They state, also, that no deed from the crown was produced. For both these things they give a very sufficient reason, when they say (page 45): "But they presume the said late Duke of York might have some other grants thereof, which Mr. Penn might give an account of, but cannot, being under a lunacy.'" Mr. Penn died in the following year, 1718. They conclude their report by submitting for consideration, "whether it will not be reasonable that your majesty's title should be established by the court of chancery, before any grant should be made of the premises." This was in the reign of George I. The application does not seem to have been further pursued, nor was any use made of the hint about chancery on that application. The title, therefore, passed undisturbed by the crown, through five reigns and a revolution, and the province continued as it was founded in 1682, though it was always in view of the authorities of England, and as has been seen, frequently subjected to the examination of the king's legal advisers.

In 1735, William Penn being dead, a bill was filed in the high court of chancery, in England, by John Penn, Thomas Penn and Richard Penn, his sons, against Charles Calvert, Lord Baltimore, to enforce the performance of the agreement made in the preceding century, for fixing the boundaries between Pennsylvania and Maryland, and between Maryland and the lower counties. Recurring now to the advice of Mr. Northey and Mr. Thompson to the crown, to have the question of title determined in chancery, there is no reason to doubt that this suit was allowed, if not directed, by the privy council. "It is certain," says Lord Hardwicke, replying to an objection to his jurisdiction, "that the original jurisdiction in cases of this kind, relating to boundaries between provinces, the dominion, and proprietary government, is in the king and council." "The king, in council, is the proper judge of the original right." He adds, that the king, in council, might look upon the agreement, and allow it as evidence of the original right, but he could not decree it as an agreement. "And therefore," he says, "the lords of the council have remitted this matter, very properly, to be determined in another place, on the foot of the contract." Lord Hardwicke was well aware of the questions to be decided finally in this case, as appears in the striking exordium of his judgment, "it being for the determination of the right and boundaries of two great provincial governments and of three counties, of a nature worthy of the judicature of a Roman senate, rather than a single judge;" adding, "and my consolation is, that, if I should err in my judgment, there is a judicature equal in dignity to a Roman senate, that will correct it." 1 Ves. Sr. 444, 445. No appeal was ever taken to the house of lords.

In the decree, liberty was reserved to either party to apply to the court, if, by "any act or right of the crown," execution of it should be obstructed. This liberty was never used. No act or right of the crown was interposed.

One of the objections, among many, made by Lord Baltimore, was upon the order of the deeds—that is, that the deed to the Duke of York was subsequent to his two feoffments. Lord Hardwicke lays aside the doctrine of estoppel, evidently not because it was inapplicable or insufficient in law for answering the objection, but because the expression of it was unnecessary, and perhaps inconsistent with the deference due to the crown. What his opinion was, is evident enough; for he says, "the duke being in the nature of a common person, was in a condition to be estopped." Being liberated from the restraints of the lord chancellor, we are at liberty to say, that the duke, at the date of the deeds, being a subject, was, in this respect, only "a common person," and as much bound by estoppel as any other subject. He did not succeed to the throne till two years after. Admitting it to be true (which cannot be admitted for reasons it would take too much time now to enter into) that the king is not bound by estoppel, it would be an unreasonable and most unjust stretch of the prerogative to suppose that, when a man ascends the throne, he is liberated from all estoppels he had previously incurred as a private person. It might as well be contended that he is freed from all grants he had previously made; for the real equity of an estoppel, in such a case as this, is neither more nor less than to make the two deeds operate as one grant, and thus do plain justice between the parties. It is no subtlety nor refinement of law, but the natural dictate of common sense and common honesty. There may, perhaps, be instances of estoppel, such as from recitals and the like, which would affect a private man, and do not touch the king; and, on this account, what is now said is limited to the very case in question. The conclusion is, that the deed of 1683 was an estoppel.

But there is another answer to the objection which satisfied Lord Hardwicke, and is fully satisfactory. If there were no estoppel, and the deed of 1683 vested the legal right in the Duke of York, where it remained when he became king, he was a trustee, a royal trustee, and the equity would be in Mr. Penn, or in the people of the province, it matters not which. That the king can be a trustee, would seem to be settled, whatever may have been formerly thought from a supposed analogy to the doctrine of uses. Lord Hardwicke is authority for this, in Penn v. Lord Baltimore, 1 Ves. Sr. 444. So is the Earl of Kildare v. Eustace, 1 Vern. 439. So is Burgess v. Wheate, 1 Eden, 223. Trusts have, in equity, a sort of independent existence for their own preservation. With reference to the trustee, actual confidence in the person is not essential. Hence, a corporation may be a trustee, and so may the king. Indeed it is an established maxim of equity, that a trust shall not perish for want of a trustee. The real difficulty, in the case of the king, is about the remedy. "The arms of equity," says Lord Northington, in Burgess v. Wheate, "are very short against the prerogative." Chancery, the appropriate forum of trusts, is without power, because it is said "it has no jurisdiction over the king's conscience: for that it is a power delegated by the king to the chancellor to exercise the king's equitable authority betwixt subject and subject." So said by counsel in Pawlett v. Attorney General, Hardr. 468. Hence, the caution of Lord Hardwicke, in Penn v. Lord Baltimore, "I will not decree a trust against the crown in this court," though he did not hesitate to declare his opinion that the king was a royal trustee. The right of the cestui que trust, however, is not questioned; nor is it questionable. There has been a suggestion that, in such cases, perhaps relief might be obtained through the exchequer, and the subject may certainly prefer a petition of right. But that is not material to the present purpose. If the right be established, no remedy is wanted; and that the equity is sufficient to raise a trust is clear, as well from what has been stated, as also from the covenant for further assurance in the deeds of 1682. There was, at all events, therefore, an equitable estate, which is quite as available as a legal estate.

This decree of Lord Hardwicke settled the validity and legal sufficiency of these deeds, the right of the province under them, and, of course, its boundaries, as described in the deeds. No appeal was taken, nor did either party ever apply, under the reservation in the decrees, to set up any "act or right of the crown." It was universally acquiesced in, and became, by its own force and common consent, the law of the land from that time forth, till the crown of England ceased to have power either to confirm or to dispute the rights about which it was made. Now, this was the same province which had been founded, as we have seen, in 1682; these were the deeds under which it was founded; and these were the boundaries by which it had been defined from the beginning.

Twenty-four years more elapsed, without controversy or question in England, its boundaries acknowledged by the crown, (the crown, in truth, had never disputed them,) when the delegates from "New Castle, Kent, and Sussex, on Delaware," on September 5th, 1774, met the delegates from the several colonies and provinces in North America, assembled at the Carpenter's Hall, in the city of Philadelphia. Journals of Congress 1774. New Jersey had also delegates there, and so had Pennsylvania and Maryland, all immediate neighbours, by whom they were bounded.

As a province or colony they were received, having a definite existence under the crown of England. Such as this province was under the crown of England on that day, such was she acknowledged to be by being received into that congress. On that day, we have seen this colony's rights under the crown, and her boundaries, which were part of them, had stood the shocks of twenty years of controversy, and finally were settled by a solemn decree in chancery, and rested securely and quietly upon the foundations laid in 1682. In the struggles and hazards which ensued this province took her full share. On July 4th 1776, she declared herself a sovereign and independent state, by the name of "Delaware," and by the united efforts of herself and her sister states was enabled to maintain it. But this state was the same that was a feeble colony in 1682, with the same metes and bounds; the same that in her more advanced age had had her metes and bounds judicially established by the high court of chancery, and, let it be added, whose boundaries had never been even questioned by the crown from the beginning, but in every way sanctioned. Could such a state, after all this, be called upon to vindicate her original rights? Lord Baltimore had a long controversy with her, because their grants interfered. But it was settled in England before the Revolution. The state of Maryland has never claimed to revive it. With New Jersey there was no interference, nor is there now. New Jersey has had no controversy with Delaware, and has none at present, so far as is known. When Delaware became a state there was no subsisting controversy with any body as to her boundaries. The change which then took place was from the condition of a dependent province of the crown of England to that of an independent sovereign state, achieved by conquest. Allegiance to England was thrown off; the royal rights reserved by charter were ended, and with them the government powers of the proprietaries derived from the crown, and all their incidents. They fell together, at the same time. The blow was not struck at the proprietaries. It was aimed at the crown, and when it took effect there, the subordinate government gave way with the head it depended upon, and ceased to exist. As far as there was any derivation in the case it was, in this sense, from the crown of England; and if there had been (as there was not) an outstanding royal claim of any sort, that, according to Martin v. Waddell, would have instantly become vested in the new sovereignty. From this view it follows, unavoidably, that if the deed from the king to the Duke of York had never existed, but only the two deeds from the Duke of York—as the province had been founded under them, had existed upon its original foundation for nearly a century, was de facto a province or colony, and received as such into the union of the colonies, and was by them all declared to be a state of the Union, has been so ever since, and still is—it would be very difficult indeed to maintain that her limits and boundaries were not incontestably proved by those deeds, unless they interfered with some superiour and better right. The de facto existence became a legal one, to all intents and purposes, by the affixing of her own sovereign seal, which had superseded the great seal of England, and acquired all its virtue and power. If necessary, this view might be carried even further. A colony or province, without any deed at all, would, under the like circumstances, have become a state; and if, from July 4th, 1776, to the present day, she has been, and still is, a state of this Union, with the same rights and privileges as the other states, and there were any authentick document to prove her boundaries, (though not a royal patent or grant,) and they interfered with no other rights, it would be very difficult to impeach her title. But even if the royal consent or recognition were indispensable, it is surely to be found in the treaty of peace, for Delaware as clearly as for any other state. And now, it is proper to remark, that all the arguments urged against her upon the very question to be decided, namely, her rights in the river, the islands, and the soil, however they may profess to be restricted, have one common fault; they go too far; they prove too much. They would take away the whole right of Delaware, land, river, islands, and all. For example, one of the learned counsel has produced the charter or patent to Lord Baltimore, and insisted that it went entirely to the river Delaware. If so, and it is in force now, the whole territory of Delaware on the main land would be taken away, and nothing left but the river right, if, indeed, that could stand alone. Whereas, as has been shown, the right between them was decided in council, November 13th, 1685, by fixing the present line; they entered into an agreement between them in conformity, and the specifick performance of that agreement was decreed in chancery in 1750. The original right has never been open since. Judge Baldwin, on the other hand, allows her title to the main land to be good by possession, which, it is respectfully submitted, is a low and precarious ground to place the title of a state upon; but he seems to deny any right but possession, and altogether to deny it as to things which were not of a nature to be actually possessed. These objections are now too late, if they ever had any foundation at all. They were long ago decided and settled in England. They were decided and settled at the Revolution; and, as to her boundaries, they stood defined and authenticated in the deeds of the Duke of York, in the patent of the king, in the proceedings of council, and in the high court of chancery, never having undergone a change from what they were at the beginning.

This course of observation, however, must here be suspended for a moment to examine the construction of the deeds, as respects the immediate question upon original grounds, lest it might be supposed that they were doubtful or insufficient, or stood in need of aid, to give them a meaning they do not of themselves properly import. Upon a careful and deliberate consideration of the whole subject, and of the arguments urged against the right of Delaware, it is believed that the deeds are quite clear. The question is, did the boundaries of the province go into the Delaware within the twelve miles circle, or did they not? The

first great rule in regard to such inquiries is, that there is to be no interpretation where there is nothing that requires to be interpreted. If the words be clear in themselves, they are to be accepted. "Words," says Rutherforth (Inst. Nat. Law, bk. 2, c. 7, § 2), "are the common signs that mankind make use of to declare their intention to one another; and when the words of a man express his meaning plainly, distinctly, and perfectly, we have no occasion to have recourse to any other means of interpretation." And for this he cites the support of Grotius. Book 2, c. 16, § 1. This is the same rule that is laid down by Blackstone. 1 Comm. 59. They all agree, too, that words are to be taken in their most usual and known signification; and technical terms and terms of art, according to the interpretation of the learned in each art, trade, or science. And how can it be otherwise? Words make contracts between parties, which are to be understood in one sense by both. How can that be, unless there be a standard to be resorted to, as nearly fixed as possible, especially, in the more important transactions of life? Now, if with this single rule, any man, learned or unlearned, will read the Duke of York's deed for the upper part of the province, and that part of the king's deed which is for the same, he will be at no loss to say what it is that they grant. They are the appropriate legal words for the purpose, and evidently used skilfully and upon deliberation, and with comparatively accurate knowledge, for the New Jersey grant and the grant to Lord Baltimore, and the charter of Pennsylvania, were all prior, and there had been a long contest with the Dutch and Swedes, who had settlements and forts on the west side of the Delaware river, from Cape Henlopen to the north line of the city of Philadelphia, where they had been in possession for nearly sixty years. Two of the principal were within the twelve miles circle; that is, one at New Castle and one at the mouth of the Christiana. Besides, the words employed are the appropriate legal terms for making the grant. When the same subject comes up for judgment, the same terms are employed for describing what was granted, as may be seen in Martin v. Waddell, and Munday v. Arnold. The same terms were used, substantially, in patents and grants which conveyed or intended to convey navigable rivers, as in the patent to the Duke of York, the grant to Lord Berkeley and Sir George Carteret, and from them to the proprietaries of New Jersey. There is still another test. If the object was to grant the river, islands and soil, could any lawyer or conveyancer have devised, or can any one now devise, a better or even as good a form of words to accomplish it? Strike them out, and all the other purposes of the deeds, it is true are effectuated without them. They are thus rendered surplusage. This would be an offence against another established rule of construction, which requires that all the words of an instrument should, if practicable, be allowed to have some sense and operation. But while these words stand, it seems to be impossible that now, after more than a century and a half, any one, and particularly any third person, and, above all, a third person without right, power or interest in the subject matter of the grant at the time it was made, and for nearly a century after, can claim to have them stricken out or disregarded.

The intimation by Judge Baldwin, in his charge, that the two grants are to be construed together as that one may control the other, so as to give them the same eastern boundary, with all respect for his learning and ability, cannot be admitted. In a legal estimate, they are not one deed, because they are two deeds; and they are not the same, because they are different. Why were they two, and why should they differ? The grantor so willed it, and he did as he willed, and as he had a right to do,

30 Fed. Cas.—73

in language evidently framed by learned advisers. They can well stand together, for there is no contradiction between them. If a man were to give estate A. in fee simple, estate B. in fee tail, and estate C. for life or years, it would seem extraordinary to say that he gave the same estate in all.

Nor is the difficulty overcome when the first step is taken. Admit (if it be possible) that the deeds are thus to be construed, which of them is to have the controlling power? the one that carries the boundary over to the low water mark, on the Jersey shore, or the one that stops at the low water mark on the Delaware side? It is apprehended that there is no legal principle to aid in deciding that question, and that in the apparent search for reasons, we should find ourselves in the region of fancy and imagination. Of what consequence can it be what were the reasons of the king and the Duke of York, or whether they had any reasons at all? Their will decided them to give what was their own, and they had a right to give. If they were not deceived in the grant, (as certainly there is no reason to believe they were,) it is wholly immaterial whether the act commended itself to other men's reason or not; whether it was wise or unwise. Neither of them has had much credit with posterity for wisdom. But this act has never been imputed to them as a crime or folly. In the most sober judgment, it must rather be deemed reasonable and meritorious. The three lower counties, at New Castle, had a width on the land of but twelve miles, being cut off to the westward by the line between them and Lord Baltimore. They had no great navigable rivers. That line, probably running upon the summit between the Delaware and Chesapeake, where the heads of the streams were turned in opposite directions, probably left them no water communication with that great estuary and its tributaries. Their neighbours, New Jersey, Pennsylvania and Maryland, all with extensive territories on the land, abounded also in great navigable rivers within their limits. Was it then, it may be inquired, so unreasonable to allot them, as a part of their possession, a little addition to their width, by giving them a part of the river, reserving only the publick rights (navigation for instance) which were free and common to every subject, and now are to every citizen of the United States? Was it so unreasonable as of itself to condemn the grant, and compel a construction against the clear words to secure its condemnation? From the circle downwards, the breadth of the land increased, and did not so much demand enlargement. Besides, at the southern point where the circle strikes the water, the river begins to widen rapidly and becomes the bay, which there might be good reasons for not granting. There is nothing which seems at all unreasonable in the grant. It was made to freemen, capable of holding and enjoying it, of transmitting it to their descendants, who, in due time, asserted and maintained their right to independence; and in the conflict which ensued, and in all the duties of its more intimate union with the other states under the constitution, Delaware has contributed its full proportion of what was required for the publick welfare and honour. So has New Jersey. In this respect they are equal. But who can say that it was more unreasonable or less conducive to the well being and happiness of our country, or of mankind, that it should have fallen to the lot of Delaware rather than of New Jersey, or been left to be equally divided between them?

But this can hardly be called legal argument. There is too much in it that is apart from the real question. What is the construction of the grant? Is it in any respect wrongful? These are the true questions. Both are believed to be with the state of Delaware.

Returning to the point digressed from, when the question of construction of the deeds was

taken up, it is only necessary to observe that the colony of the three lower counties having been received into the congress, became in due time a state. This ·was a great change. But, great as it was, it was the whole change. No one ever thought that by becoming a state, the territorial rights and possessions previously belonging to it, were redu₂ed or altered. Where was there a power to do either? Not, surely, in any other state. As surely, not in the congress of the United States; and these two descriptions embrace the whole ·circle of acknowledged authority. When the charters of some of the states were found to include large masses of vacant land, which might be dangerous to the peace of the Union, did congress, or either or all of·the states, attempt to define or limit their boundaries? Congress invited them to make cessions, which they freely and patriotically did,·by compact, and with the conditions they thought fit to insist upon and congress to accept. The Declaration of Independence, from the day it was made. is thenceforth the title of every state.

What remains, then, to be considered, may be embraced in this general inquiry: Has the state of Delaware, by any act or default of her own, parted with or lost the right she then had, or any part of it?

The examination of this question must, however, be preceded by an observation no one will refuse his assent to, which, nevertheless, when fairly carried out, will be found to meet and conclusively to answer most, if not all, the objections alleged to the title of the United States, derived from the state of Delaware. It is this: that the inquiry is to be understood as applied to a sovereign state, with all the attributes of sovereignty. except such as have been yielded to the United States. Whoever would claim from her, or would claim against her, must, therefore, make out such a case ·as will be available against a sovereign. More clearly must it be so, if the claim be to take from her a portion of her territory, and a part of her boundaries; not to come in under her and be one of her community, but to transfer them to an alien jurisdiction; in other words, to make them part and parcel of another state. Such is the claim made by Mr. Humphrey. The right he asserts is not under the state of Delaware, but adverse to her.

As long as the discussion was upon the boundaries of the respective states, every argument which conduces to show the right to be in one rather than the other, is fairly applicable and entitled to respectful attention, which they have accordingly received. But the moment that point is settled, and the boundaries established, all within the line on the respective sides is part of the territory of the one it is adjudged to, and it is subject to her exclusive sovereign jurisdiction. To her alone belongs the rightful power to govern and make laws for it, without interference by the United States, or by any state. That there was a dispute about boundaries, was a good reason for settling it; but none for holding it less the territory of the state after the dispute is settled, than any other part of her possessions. No one, for example, would affirm that what fell into Maryland or Delaware by fixing the line between them, or into Pennsylvania or Maryland, or into Pennsylvania or Virginia, by fixing their lines, is less within their jurisdiction than any other portion of the territories of these states. Wherever their limits are, up to that line, their law making power extends and governs. This principle, believed to be undeniable, applies in full force to the present case. If it has been necessary, for the purpose of deciding the controversy about the Pea Patch, to determine, incidentally, the question of the boundaries of the two states at that part of the river, (and it has been so argued on both sides,) and it has been determined that the island is within the territory of Delaware, it must follow that the

island is also within her sovereignty; and whoever puts his foot upon it, is subject to her laws just as much as if he resided in New Castle or in Wilmington. Whoever would seek to recover it at law, must go into her courts, including in that description the circuit court of the United States, where there are proper parties; a court established for administering the laws of the state, in civil cases, where one of the parties is an alien, &c of another state, or otherwise entitled to the aid of an United States tribunal: but still to administer those laws. In regard to the Pea Patch, there has been a conflict of jurisdiction. Dr. Gale brought an ejectment in the .circuit court of the United States for the district of New Jersey, recovered a judgment, and obtained an execution. The United States brought an ejectment in the district of Delaware, got a judgment, issued an execution, and the marshal of Delaware was authorized to turn out those whom the marshal of New Jersey had .been authorized to put in. Records of both were ·produced. Both ·were necessarily disregarded as affecting the question now under consideration. The only thing certain about them ·was, that both could not have jurisdiction: and which of them had, .depended upon exactly the same point as the present case turns upon, namely: whether the island was in New Jersey or Delaware. And it may also be remarked, that in one of them (Delaware) the judgment was by default; in the other, it was upon a trial essentially ex-parte, with a very imperfect exhibition of evidence, by no means to be compared with what has been produced in this arbitration. ·

Considering it to be established that the island is within the limits of Delaware, Mr. Humphrey is to make out a title to it in one of two ways: by showing that he has himself acquired it, in which case he must show that his acquisition of ·it ·has been under or according to the laws of Delaware; or that New Jersey·has acquired it, and that her title enures to his use.

As to the first, nothing has been alleged but possession: By the laws of Delaware, possession does not avail·against the state. The statute of limitation, between individuals. is truly said to be a law of peace. An exception to it, in favour of states, or a considerable extension of time in their behalf, may be as truly said to be a law of necessity; for states cannot occupy, as individuals, so as to have an actual manifest possession, which is notice; nor can they apply the same vigilance which is reasonably required of private proprietors. It is not necessary to dwell on this. Actual possession there has not been.· His honour, the late Judge Baldwin, says, that by the survey of 1784, and its acceptance by the· proprietaries, the Messrs. Hall, and Dr. Gale under them, stood in the place of the West New Jersey proprietaries. with all their rights. "His legal seizin or possession," continued for thirty-one years, till 1815, would bar the right of entry of any adverse claimant. Had the right been in the proprietaries. and the island within New Jersey, the legal seizin or possession. as before stated, would have accompanied the grant. But neither part of the postulate is correct. The proprietaries had no right, as has been seen, and the island was not within New Jersey. When Dr. Gale, or some one claiming under him, obtained the title of the state. in 1831, he could get no legal seizin, for one of the reasons already stated; and for this additional one, that the United States were then in actual adverse possession.

Thus, then, there was no legal seizin or possession. That there was no actual possession under the survey, worthy to be so called, or to found a right upon, seems to be an unavoidable inference from the evidence. The survey ·could not have been made on the ground. Its date, 1784, is near the time when the island was about the size of "a man's hat," and over-

flowed every high tide. There was no resting place upon it for the surveyor's foot or his instrument. But there is something else, much more conclusive. The surveyor returns the contents to be 178 acres. More than fifty years afterwards, when the island had been growing all the time, it contained by accurate measurement, only 87.60 acres. The surveyor, therefore, did not begin a possession, though he made a sufficient survey if the proprietaries accepted it, as they certainly did. No survey, indeed, was necessary, for an island is sufficiently defined by the waters. The only other evidence of possession is, that in the spring of 1813, April or May, Dr. Gale took down a large party of men. The witness who proved it was one of the company. He said they went there to fish, and it was stated that Dr. Gale had in view to make a fishery, but it did not answer, on account of the strength and direction of the currents, which swept the nets into deep water and let the fish escape. They found upon the island a rough frame house, recently erected, (probably by Dr. Gale,) of one story in height, with one room in it, and no chimney or fire-place. They used, for cooking, a stove they carried down in a boat and brought away with them. They left the island in August, and, as far as appears, never returned. What became of the house is not in proof. The occurrence just related was after the military officers of the United States had fixed their attention upon the spot as a site for the defence of the river. About the same time, General Bloomfield, who was in command of the military district, went to Delaware to negotiate a cession of the island to the United States, being himself a citizen of New Jersey, and having been her governour and ex-officio chancellor, and it is reasonable to suppose acquainted with her rights. In December 1814, Captain Clarke, of the United States topographical engineers, under orders from the war department, taking with him one hundred soldiers and some thirty or forty workmen, and the frame of a block house, went upon the island to commence the work of a fortification, and remained there till June, 1816. He states that there was nobody on the island when he went there, nor any building or "vestige" of one, and that nobody was there during his stay but those under his command. From the survey, then, until 1816, there was no possession, and from that time the United States have been in possession. The fishing visit of 1813, cannot be called a possession, and if, connected with Dr. Gale's claim of title, it might be so termed for the time, still it was abandoned, leaving no mark of ownership. There was no actual possession, therefore, even if that could have been available. The evidence is that the island was occupied only by crows, selected by them as a lodging place for its solitude and security.

Has the state of New Jersey acquired any right under which his claim could be covered? If a case were established, in point of fact, it would be necessary to inquire how such a right could be acquired by New Jersey, the territory in question being within the state of Delaware, and subject to her laws and government. But it does not seem requisite to enter upon that inquiry, inasmuch as the proofs are deemed to have made out no such case. The controversy, it will be seen, embraces two descriptions of rights, namely, the river and the soil under it, and islands in the river. The former is not susceptible of actual possession—the latter are. To begin with the latter. The evidence is, that within the twelve miles circle, before the Pea Patch made its appearance, there were only two islands, (so called,) Reedy Island and Bombay Hook. They have both been in the possession and under the jurisdiction of Delaware. Bombay Hook, it is believed, cannot with propriety be called an island in the river. It lies within the line of the main land of Delaware, above the low water mark of the river, and has been surrounded by water only by reason of an artificial outlet being cut for Duck creek into the bay. There remains then, only Reedy Island. It may be said that it lies nearest to the Delaware shore. But it was in the river, and if the right to the river and islands was in the crown, while Delaware was a province, Delaware could have no right in Reedy Island, whether it was on one side or the other of the channel. Her possession, as of right, is thus a strong proof that her title was prior to that which would have accrued to her by the devestiture of the right of the crown, and the leaving of the river vacant between two states. New Jersey had no island within the twelve miles circle.

A passage in Smith's History of New Jersey, it was thought, disclosed some right of New Jersey to an island there called Stuypson's Island. The author, in giving an account of a negotiation with the Indians, says: "Also Stuypson's Island, near Delaware river. Tom Store claims thirty acres," &c. The island was not found upon the map during the investigation, being searched for in the river, though Smith's language, "near Delaware river," indicated that the distance was not from the land into the river, but from the river into the land. A close examination since, has shown that it is what may be called an "inland island," formed by small streams, with, perhaps, the river on one side, but above the low water mark, and within the outline of the land, as "Bombay Hook," is on the other. It is far below the twelve miles circle, and is undoubtedly a part of New Jersey, by her original right; but not an island in the river or bay.

Something was also said about Egg Island, but no evidence given. From the map it appears to be a very small island, low down in the bay, out of the circle, lying near the main land of New Jersey. Whether it is separated from the main, or adjoins it, by whom it is held, if by any body, and under what tenure, there is no proof in the case. New Jersey, or those claiming under her, had no island within the twelve miles.

As to the Pea Patch Island, New Jersey had at no time possession, and cannot be said to have set up a right to it. The contrary is quite clear. The right asserted was that of the West New Jersey proprietaries, which, as has been seen, was adverse to the state, and could not in any way enure to her use. So of the right of Dr. Gale and those deriving from him. And when, at last, it came to be doubted whether the proprietaries had any right at all, and when the United States were in actual possession, and New Jersey was asked for an act, that act did not assert any title, but only released her right and interest, whatever it might be. Delaware, on the other hand, was in possession, as far as a state could be. There is satisfactory evidence as to one individual residing on the island after the United States entered upon it: that he was assessed and voted in Red Lion hundred.

So much for the islands. Now as to the jurisdiction. There is no evidence to establish a single instance of its exercise by New Jersey over that part of the river and islands, and there is no reason to believe that there was one. One witness was called, to show that process from New Jersey had been once served upon the Pea Patch Island, in recent times: but it failed entirely. There was no process; there was no arrest, and all that was made out was that a constable from Salem county came with a pistol, and went away without a prisoner. The ejectment in the circuit court of the United States for the New Jersey district, is of no weight. It was brought by an individual, of his own authority; it was after this controversy had begun, and for the purpose of determining this controversy.

On the part of Delaware, the evidence is full and complete of the exercise of jurisdiction over

that part of the river and islands, as far back as evidence can be expected to go. The process of her courts, and of the courts of the United States sitting in that district, for the arrest of persons and property afloat, has been issued and executed, and continues so to be, quite over to the low water mark on the Jersey side; and this, not occasionally, but habitually, without doubt or question, as a matter of course, whenever applied for. Such arrests have been made of persons and property escaping from above. The cases have been contested upon every ground that ingenuity could suggest, or the zeal of parties prompt; but there never has been an instance of any one disputing the jurisdiction in the courts either of the state or of the Union. This must be admitted to be very persuasive evidence. In the absence of proof to the contrary, it must be deemed conclusive.

Now, this evidence comes from numerous witnesses, of great intelligence and unquestionable credit, well informed upon the subject they speak of, by their pursuits in life, and it coincides (for it did not require support or corroboration) with the proof of particular instances, both by parol and exemplifications of records here produced. The exhibition of the evidence at large, or even a considerable part of it, would be tedious and unnecessary. The whole was carefully reduced to writing, and will be preserved.[10] But it is quite impossible to look at the list of witnesses without feeling unbounded confidence that, from their own experience, and from the traditions and other sources of information of the past, which lawyers and judges are obliged to explore, and to follow as their guide, we have the whole knowledge of what has been held and done from an early, perhaps the earliest, period, concentrated and condensed in this body of testimony. With nothing to contradict it, (and there is nothing,) one might safely say, such has always been the law of Delaware. Kensey Johns, Esq. for example, above eighty-eight years of age, states "that he has resided in New Castle since 1780, now sixty-seven years. He was a practising lawyer for twelve years, afterwards chief justice of the supreme court for thirty-eight years, afterwards chancellor of the state, since that time, and at present, living a private gentleman." Any one else, speaking of him, would add, and during the whole of this lengthened period, exercising a most wholesome influence by example and precept, upon the minds and morals of the community he lived in. He says: "It has always been considered and held by the courts, publick officers and lawyers of Delaware, as far as my memory reaches, that the title and jurisdiction of the state of Delaware, extended to a circle of twelve miles around New Castle, to low water mark on the New Jersey shore. I have never heard the title and jurisdiction of the state of Delaware, over that part of the river Delaware, doubted by any court, publick officer or lawyer in Delaware, on any occasion whatever. Within my knowledge and remembrance, writs have been often issued out of the courts of Delaware, to seize vessels and persons in all parts of the river Delaware, within the circle to low water mark on the New Jersey shore, and no dispute, question, or plea was ever made or suggested, within my memory, before any court in Delaware, against the title of Delaware over all such parts." And, again: "The state of Delaware, for the whole period of my remembrance, and as far back as my researches extend, has claimed and exercised jurisdiction

over the Delaware river and soil thereof, within the circle, to low water mark on the Jersey shore, and the state has never failed to exercise this jurisdiction when called upon or asked to do so." Eleven other witnesses, eminent citizens of Delaware, with large means of knowledge, whose names, if repeated, would command respect for their testimony, make similar statements, and some of them give an account of particular cases of arrest and seizure, known to them personally. John Steele, also a citizen of Pennsylvania, gives an account of his following a vessel down the river, getting process against her from a court in Delaware, and having it executed far over on the east side of the river.

New Jersey, as before stated, never objected to the claim of Delaware, nor, as far as appears, set up any claim of her own. In 1709 the boundaries of counties were fixed by an act of the legislature. Those on the Delaware were bounded on the west by the river, the lines running along the river shore, and not into the river. In 1822, it is true, an act was passed to extend one or more of the lower counties into the river. But this was after the United States had obtained the cession from Delaware, was in actual possession, and this controversy had begun. Besides, of what avail is such an act of the legislature, except as some evidence (under the circumstances just mentioned, very feeble, indeed) of a belief of right, and keeping up of a claim over her own territory. A constitutional act of a state legislature, touching any part of such territory, is undoubtedly potent, and is notice to all the world; but as to territory of another state, it is inoperative, and it is notice to nobody. This act, therefore, is of no effect.

Upon all the grounds thus reviewed, the conclusion is, that the title to the Pea Patch Island was in the state of Delaware. On May 27, 1813, that state, by an act of her legislature, ceded it to the United States upon conditions having regard to the publick benefit, and not for any selfish interest of her own. No doubt can be entertained that New Jersey would, in the like case, have done as her sister Delaware did, had she been free to do so. But a private claim had intervened, which she had no rightful power to dispose of; and, if it has so happened that, after a long and costly litigation, that claim has proved to be unfounded, it is to be regretted that the claimant should have been put to useless expense and trouble; but this feeling can have no influence in determining the question of right.

By the cession of Delaware the title passed to the United States. The award, therefore, must be, and is, that the title is in the United States.

### Award.

Under and by virtue of the foregoing agreement and submission, having heard the parties by their counsel, their proofs and allegations, and duly and deliberately considered the whole matter, and weighed the evidence and arguments on both sides, I do hereby award that the title to the Pea Patch Island is in the United States.

In witness whereof, I have hereunto set my hand and seal, this fifteenth day of January, in the year of our Lord one thousand eight hundred and forty-eight, at the city of Washington.

JOHN SERGEANT. (Seal.)

Witness:

JOHN WM. WALLACE, Secretary of the Reference.

JOHN M. CLAYTON, Senator from Delaware.

WILLIAM L. DAYTON, Senator from New Jersey.

PIRACY—CHARGE TO GRAND JURY IN RELATION TO PIRACY. See Cases Nos. 18,256 and 18,277.

---

[10] This, with the other evidence and proceedings in the case, all which were recorded by the secretary of the reference, was transmitted by the arbitrator, after making his award, to the office of the solicitor of the treasury of the United States. A call was subsequently made by the senate for these papers. Having been transmitted to that body and read there, they were ordered to be printed, and will be found among the senate documents (Executive, No. 21) of the first session of the 30th congress.